## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION v. BOARD OF REGENTS OF UNIVERSITY OF OKLAHOMA ET AL.

No. A–24.   Decided July 21, 1983

JUSTICE WHITE, Circuit Justice.

The application for a stay is granted, and the temporary stay of the judgments of the Court of Appeals and the District Court is continued pending the timely filing and disposition of a petition for writ of certiorari in the above-entitled action.   If the petition is denied, this stay will terminate automatically.   If certiorari is granted, the stay will continue in effect, pending judgment on the merits or other disposition of the case.   Briefly stated, the reasons for granting the stay are as follows.

The National Collegiate Athletic Association is a private, nonprofit association of some 900 4-year colleges and universities meeting certain academic standards and of athletic conferences, associations, and other groups interested in intercollegiate athletics.   Of these, some 800 are voting members, about 500 field football teams, and 187 are so-called Division I

schools. These latter schools, the District Court found, dominate college football television.

The NCAA regulates many aspects of intercollegiate athletics, including the televising of intercollegiate football games, the arrangements for which it has controlled since 1953. The current plan involves contracts with two networks, CBS and ABC, covering the 1982–1985 seasons, as well as a 2-year contract with the Turner Broadcasting System. The District Court, in describing the contracts, stated that each network must broadcast a game on at least 14 different dates, and each must televise at least 35 games each year. At least seven broadcasts must be national and at least six regional. The networks select the games they will broadcast, at least 82 different teams must appear on each network over a 2-year period, and no school may appear more than six times during a 2-year period. Each network is obligated to pay a minimum of $131,750,000 over the four years; TBS will pay $17,696,000 over two years. From these sums, the NCAA takes a percentage, certain sums are reserved for participants in the Division II and III competitions, and the balance is divided equally among those schools who have appeared on the broadcasts covered by the contracts. Schools not selected to appear under the contract are not permitted to make their own arrangements to broadcast their games, and schools that do appear may not undertake to have additional games televised.

The Regents of the University of Oklahoma and the University of Georgia Athletic Association brought this action against the NCAA, asserting that the NCAA's regulatory scheme violates the antitrust laws. The District Court agreed, holding that the scheme constituted price fixing that was illegal *per se* under § 1 of the Sherman Act and the relevant cases; it also held that the arrangement was an illegal group boycott, was monopolization forbidden by § 2, and was in any event an unreasonable restraint of trade. 546 F. Supp. 1276 (WD Okla. 1982). The contracts were declared

null and void, and an injunction was entered forbidding their further implementation.

The Court of Appeals for the Tenth Circuit, while disagreeing with the boycott and monopolization holdings, otherwise upheld the decision of the District Court. 707 F. 2d 1147 (1983). Although it ordered the judgment affirmed, it remanded with instructions that the District Court "consider its injunction in light of" the Court of Appeals' opinion. *Id.*, at 1162. The court's mandate has issued. The NCAA, asserting that it will petition for certiorari, has requested a stay; the respondents have opposed the stay, as has the United States as *amicus curiae.*

Having examined the papers so far filed with me and assuming that they fairly represent the issues and what has occurred in this case, I can say with confidence that I would vote to grant certiorari. Somewhat less confidently, I expect that at least three other Justices would likewise vote to grant. The judgment below would obviously have a major impact countrywide, and the case plainly presents important issues under the antitrust laws.

I also have little doubt that if certiorari is to be granted the equities pending decision on the merits are with the NCAA. The two respondent schools might do better for themselves during the 1983 season if they were free to go their own way, but were a stay to issue, their harm would be limited to the difference between what they would receive under the NCAA arrangements and what they could otherwise garner. On the other hand, unless the judgment is stayed, it would appear that the networks' contracts would be void under the outstanding judgment and could not be enforced; the entire 1983 season would be at risk not only for the NCAA but also for many, if not most, of the schools which it represents, including many schools that would prefer the NCAA arrangements to continue at least through the 1983 season.

Although the question is a close one, I am also of the view that there is a sufficient likelihood that the court below erred

in one or more important respects to justify issuing the stay. For example, the *per se* price-fixing holding is questionable to my mind; also, although in the long run I may agree with the courts below in this respect, I have some doubt whether they reached the correct result under the Rule of Reason.

Accordingly, having determined that certiorari will likely be granted, that there is a sufficient prospect that the NCAA will ultimately prevail, and that the equities favor the NCAA, I conclude that a stay is in order.

Respondents suggest that the NCAA should be required to post bond if the stay is granted. I am not inclined to impose that requirement. I note that the Court of Appeals stayed the judgment of the District Court without bond while the case was on appeal to it. I see no need to change that procedure.