# NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
# *v.* BOARD OF REGENTS OF THE UNIVERSITY OF
# OKLAHOMA ET AL.

No. 83–271.   Argued March 20, 1984—Decided June 27, 1984

86

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 120.

*Frank H. Easterbrook* argued the cause for petitioner. With him on the briefs were *George H. Gangwere* and *James D. Fellers.*

*Andy Coats* argued the cause for respondents. With him on the brief were *Clyde A. Muchmore, Erwin N. Griswold, J. Ralph Beaird,* and *James F. Ponsoldt.*

*Solicitor General Lee* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Deputy Assistant Attorney Gen-*

*eral Ginsberg, Jerrold J. Ganzfried, Barry Grossman,* and *Andrea Limmer.**

JUSTICE STEVENS delivered the opinion of the Court.

The University of Oklahoma and the University of Georgia contend that the National Collegiate Athletic Association has unreasonably restrained trade in the televising of college football games. After an extended trial, the District Court found that the NCAA had violated § 1 of the Sherman Act[1] and granted injunctive relief. 546 F. Supp. 1276 (WD Okla. 1982). The Court of Appeals agreed that the statute had been violated but modified the remedy in some respects. 707 F. 2d 1147 (CA10 1983). We granted certiorari, 464 U. S. 913 (1983), and now affirm.

I

*The NCAA*

Since its inception in 1905, the NCAA has played an important role in the regulation of amateur collegiate sports. It has adopted and promulgated playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of athletes, and rules governing the size of athletic squads and coaching staffs. In some sports, such as baseball, swimming, basketball, wrestling, and track, it has sponsored and conducted national tournaments. It has not done so in the sport of football, however. With the

---

*Gerald A. Caplan* and *Alexander Halpern* filed a brief for the National Federation of State High School Associations as *amicus curiae* urging reversal.

*Forrest A. Hainline III* and *J. Laurent Scharff* filed a brief for the Association of Independent Television Stations, Inc., as *amicus curiae* urging affirmance.

[1] Section 1 provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." 26 Stat. 209, as amended, 15 U. S. C. § 1.

exception of football, the NCAA has not undertaken any regulation of the televising of athletic events.[2]

The NCAA has approximately 850 voting members. The regular members are classified into separate divisions to reflect differences in size and scope of their athletic programs. Division I includes 276 colleges with major athletic programs; in this group only 187 play intercollegiate football. Divisions II and III include approximately 500 colleges with less extensive athletic programs. Division I has been subdivided into Divisions I–A and I–AA for football.

Some years ago, five major conferences together with major football-playing independent institutions organized the College Football Association (CFA). The original purpose of the CFA was to promote the interests of major football-playing schools within the NCAA structure. The Universities of Oklahoma and Georgia, respondents in this Court, are members of the CFA.

*History of the NCAA Television Plan*

In 1938, the University of Pennsylvania televised one of its home games.[3] From 1940 through the 1950 season all of Pennsylvania's home games were televised. App. 303. That was the beginning of the relationship between television and college football.

On January 11, 1951, a three-person "Television Committee," appointed during the preceding year, delivered a report to the NCAA's annual convention in Dallas. Based on preliminary surveys, the committee had concluded that "television does have an adverse effect on college football attendance and unless brought under some control threatens to seriously harm the nation's overall athletic and physical

---

[2] Presumably, however, it sells the television rights to events that the NCAA itself conducts.

[3] According to the NCAA football television committee's 1981 briefing book: "As far as is known, there were [then] six television sets in Philadelphia; and all were tuned to the game." App. 244.

system." *Id.*, at 265. The report emphasized that "the television problem is truly a national one and requires collective action by the colleges." *Id.*, at 270. As a result, the NCAA decided to retain the National Opinion Research Center (NORC) to study the impact of television on live attendance, and to declare a moratorium on the televising of football games. A television committee was appointed to implement the decision and to develop an NCAA television plan for 1951. *Id.*, at 277–278.

The committee's 1951 plan provided that only one game a week could be telecast in each area, with a total blackout on 3 of the 10 Saturdays during the season. A team could appear on television only twice during a season. The plan also provided that the NORC would conduct a systematic study of the effects of the program on attendance. *Id.*, at 279. The plan received the virtually unanimous support of the NCAA membership; only the University of Pennsylvania challenged it. Pennsylvania announced that it would televise all its home games. The council of the NCAA thereafter declared Pennsylvania a member in bad standing and the four institutions scheduled to play at Pennsylvania in 1951 refused to do so. Pennsylvania then reconsidered its decision and abided by the NCAA plan. *Id.*, at 280–281.

During each of the succeeding five seasons, studies were made which tended to indicate that television had an adverse effect on attendance at college football games. During those years the NCAA continued to exercise complete control over the number of games that could be televised. *Id.*, at 325–359.

From 1952 through 1977 the NCAA television committee followed essentially the same procedure for developing its television plans. It would first circulate a questionnaire to the membership and then use the responses as a basis for formulating a plan for the ensuing season. The plan was then submitted to a vote by means of a mail referendum. Once approved, the plan formed the basis for NCAA's negotiations

with the networks. Throughout this period the plans retained the essential purposes of the original plan. See 546 F. Supp., at 1283.[4] Until 1977 the contracts were all for either 1- or 2-year terms: In 1977 the NCAA adopted "principles of negotiation" for the future and discontinued the practice of submitting each plan for membership approval. Then the NCAA also entered into its first 4-year contract granting exclusive rights to the American Broadcasting Cos. (ABC) for the 1978–1981 seasons. ABC had held the exclusive rights to network telecasts of NCAA football games since 1965. *Id.*, at 1283–1284.

## *The Current Plan*

The plan adopted in 1981 for the 1982–1985 seasons is at issue in this case.[5] This plan, like each of its predecessors, recites that it is intended to reduce, insofar as possible, the adverse effects of live television upon football game attendance.[6] It provides that "all forms of television of the football

---

[4] The television committee's 1981 briefing book elaborates:

"In 1952, the NCAA Television Committee initiated a plan for controlling the televising of college football games. The plans have remained remarkably similar as to their essential features over the past 30 years. They have had the following primary objectives and purposes:

"1. To reduce, insofar as possible, the adverse effects of live television upon football game attendance and, in turn, upon the athletic and education programs dependent upon that football attendance;

"2. To spread television among as many NCAA member colleges as possible; and

"3. To provide football television to the public to the extent compatible with the other two objectives." *Ibid.*

[5] Because respondents sought and obtained only injunctive relief against future violations of § 1 in the District Court, we do not consider previous NCAA television plans except to the extent that they shed light on the purpose and effect of the current plan.

[6] "The purposes of this Plan shall be to reduce, insofar as possible, the adverse effects of live television upon football game attendance and, in turn, upon the athletic and related educational programs dependent upon the proceeds therefrom; to spread football television participation among

games of NCAA member institutions during the Plan control periods shall be in accordance with this Plan." App. 35. The plan recites that the television committee has awarded rights to negotiate and contract for the telecasting of college football games of members of the NCAA to two "carrying networks." *Id.*, at 36. In addition to the principal award of rights to the carrying networks, the plan also describes rights for a "supplementary series" that had been awarded for the 1982 and 1983 seasons,[7] as well as a procedure for permitting specific "exception telecasts."[8]

In separate agreements with each of the carrying networks, ABC and the Columbia Broadcasting System (CBS), the NCAA granted each the right to telecast the 14 live "exposures" described in the plan, in accordance with the "ground rules" set forth therein.[9] Each of the networks agreed to pay a specified "minimum aggregate compensation

---

as many colleges as practicable; to reflect properly the image of universities as educational institutions; to promote college football through the use of television, to advance the overall interests of intercollegiate athletics, and to provide college football television to the public to the extent compatible with these other objectives." *Id.*, at 35 (parenthetical omitted).

[7] The supplementary series is described in a separate article of the plan. It is to consist of no more than 36 exposures in each of the first two years and no more than 40 exposures in the third and fourth years of the plan. Those exposures are to be scheduled on Saturday evenings or at other times that do not conflict with the principal football series that is scheduled for Saturday afternoons. *Id.*, at 86–92.

[8] An "exception" telecast is permitted in the home team's market of games that are sold out, and in the visiting team's market of games played more than 400 miles from the visiting team's campus, but in both cases only if the broadcast would not be shown in an area where another college football game is to be played. *Id.*, at 62–72. Also, Division II and Division III institutions are allowed complete freedom to televise their games, except that the games may not appear on a network of more than five stations without the permission of the NCAA. *Id.*, at 73–74.

[9] In addition to its contracts with the carrying networks, the NCAA has contracted with Turner Broadcasting System, Inc. (TBS), for the exclusive right to cablecast NCAA football games. The minimum aggregate fee for the initial 2-year period of the TBS contract is $17,696,000. 546 F. Supp., at 1291–1292.

to the participating NCAA member institutions" during the 4-year period in an amount that totaled $131,750,000. In essence the agreement authorized each network to negotiate directly with member schools for the right to televise their games. The agreement itself does not describe the method of computing the compensation for each game, but the practice that has developed over the years and that the District Court found would be followed under the current agreement involved the setting of a recommended fee by a representative of the NCAA for different types of telecasts, with national telecasts being the most valuable, regional telecasts being less valuable, and Division II or Division III games commanding a still lower price.[10] The aggregate of all these payments presumably equals the total minimum aggregate compensation set forth in the basic agreement. Except for differences in payment between national and regional telecasts, and with respect to Division II and Division III games, the amount that any team receives does not change with the size of the viewing audience, the number of markets in which the game is telecast, or the particular characteristic of the game or the participating teams. Instead, the "ground rules" provide that the carrying networks make alternate selections of those games they wish to televise, and thereby obtain the exclusive right to submit a bid at an essentially fixed price to the institutions involved. See 546 F. Supp., at 1289–1293.[11]

---

[10] The football television committee's briefing book for 1981 recites that a fee of $600,000 was paid for each of the 12 national games telecast by ABC during the regular fall season and $426,779 was paid for each of the 46 regional telecasts in 1980. App. 250. The report further recites: "Division I members received $27,842,185 from 1980 football television revenue, 89.8 percent of the total. Division II's share was $625,195 (2.0 percent), while Division III received $385,195 (1.3 percent) and the NCAA $2,147,425 (6.9 percent)." Id., at 251.

[11] The District Court explained how the agreement eliminates competition for broadcasting rights:

"First, the networks have no intention to engage in bidding. Second, once the network holding first choice for any given date has made its choice and

The plan also contains "appearance requirements" and "appearance limitations" which pertain to each of the 2-year periods that the plan is in effect. The basic requirement imposed on each of the two networks is that it must schedule appearances for at least 82 different member institutions during each 2-year period. Under the appearance limitations no member institution is eligible to appear on television more than a total of six times and more than four times nationally, with the appearances to be divided equally between the two carrying networks. See *id.*, at 1293. The number of exposures specified in the contracts also sets an absolute maximum on the number of games that can be broadcast.

Thus, although the current plan is more elaborate than any of its predecessors, it retains the essential features of each of them. It limits the total amount of televised intercollegiate football and the number of games that any one team may televise. No member is permitted to make any sale of television rights except in accordance with the basic plan.

*Background of this Controversy*

Beginning in 1979 CFA members began to advocate that colleges with major football programs should have a greater voice in the formulation of football television policy than they had in the NCAA. CFA therefore investigated the possibility of negotiating a television agreement of its own, devel-

---

agreed to a rights fee for that game with the two teams involved, the other network is then in a monopsony position. The schools cannot threaten to sell the broadcast rights to any other network. They cannot sell to NBC without committing a violation of NCAA rules. They cannot sell to the network which had first choice over that particular date because, again, they would be in violation of NCAA rules, and the network would be in violation of its agreement with NCAA. Thus, NCAA creates a single eligible buyer for the product of all but the two schools selected by the network having first choice. Free market competition is thus destroyed under the new plan." 546 F. Supp., at 1292–1293.

oped an independent plan, and obtained a contract offer from the National Broadcasting Co. (NBC). This contract, which it signed in August 1981, would have allowed a more liberal number of appearances for each institution, and would have increased the overall revenues realized by CFA members. See *id.*, at 1286.

In response the NCAA publicly announced that it would take disciplinary action against any CFA member that complied with the CFA-NBC contract. The NCAA made it clear that sanctions would not be limited to the football programs of CFA members, but would apply to other sports as well. On September 8, 1981, respondents commenced this action in the United States District Court for the Western District of Oklahoma and obtained a preliminary injunction preventing the NCAA from initiating disciplinary proceedings or otherwise interfering with CFA's efforts to perform its agreement with NBC. Notwithstanding the entry of the injunction, most CFA members were unwilling to commit themselves to the new contractual arrangement with NBC in the face of the theatened sanctions and therefore the agreement was never consummated. See *id.*, at 1286–1287.

## Decision of the District Court

After a full trial, the District Court held that the controls exercised by the NCAA over the televising of college football games violated the Sherman Act. The District Court defined the relevant market as "live college football television" because it found that alternative programming has a significantly different and lesser audience appeal. *Id.*, at 1297–1300.[12] The District Court then concluded that the NCAA

---

[12] The District Court held that the NCAA had monopolized the relevant market in violation of § 2 of the Sherman Act, 15 U. S. C. § 2. See 546 F. Supp., at 1319–1323. The Court of Appeals found it unnecessary to reach this issue, as do we.

controls over college football are those of a "classic cartel" with an

> "almost absolute control over the supply of college football which is made available to the networks, to television advertisers, and ultimately to the viewing public. Like all other cartels, NCAA members have sought and achieved a price for their product which is, in most instances, artificially high. The NCAA cartel imposes production limits on its members, and maintains mechanisms for punishing cartel members who seek to stray from these production quotas. The cartel has established a uniform price for the products of each of the member producers, with no regard for the differing quality of these products or the consumer demand for these various products." *Id.*, at 1300–1301.

The District Court found that competition in the relevant market had been restrained in three ways: (1) NCAA fixed the price for particular telecasts; (2) its exclusive network contracts were tantamount to a group boycott of all other potential broadcasters and its threat of sanctions against its own members constituted a threatened boycott of potential competitors; and (3) its plan placed an artificial limit on the production of televised college football. *Id.*, at 1293–1295.

In the District Court the NCAA offered two principal justifications for its television policies: that they protected the gate attendance of its members and that they tended to preserve a competitive balance among the football programs of the various schools. The District Court rejected the first justification because the evidence did not support the claim that college football television adversely affected gate attendance. *Id.*, at 1295–1296. With respect to the "competitive balance" argument, the District Court found that the evidence failed to show that the NCAA regulations on matters such as recruitment and the standards for preserving amateurism were not sufficient to maintain an appropriate balance. *Id.*, at 1296.

*Decision of the Court of Appeals*

The Court of Appeals held that the NCAA television plan constituted illegal *per se* price fixing, 707 F. 2d, at 1152.[13] It rejected each of the three arguments advanced by NCAA to establish the procompetitive character of its plan.[14] First, the court rejected the argument that the television plan promoted live attendance, noting that since the plan involved a concomitant reduction in viewership the plan did not result in a net increase in output and hence was not procompetitive. *Id.*, at 1153–1154. Second, the Court of Appeals rejected as illegitimate the NCAA's purpose of promoting athletically balanced competition. It held that such a consideration amounted to an argument that "competition will destroy the market"—a position inconsistent with the policy of the Sherman Act. Moreover, assuming *arguendo* that the justification was legitimate, the court agreed with the District Court's finding "that any contribution the plan made to athletic balance could be achieved by less restrictive means." *Id.*, at 1154. Third, the Court of Appeals refused to view the NCAA plan as competitively justified by the need to compete effectively with other types of television programming, since it entirely eliminated competition between producers of football and hence was illegal *per se*. *Id.*, at 1155–1156.

Finally, the Court of Appeals concluded that even if the television plan were not *per se* illegal, its anticompetitive limitation on price and output was not offset by any

---

[13] The Court of Appeals rejected the District Court's boycott holding, since all broadcasters were free to negotiate for a contract as carrying networks and the threat of sanctions against members for violating NCAA rules could not be considered a boycott if the rules were otherwise valid. 707 F. 2d, at 1160–1161.

[14] In the Court of Appeals as well as the District Court, petitioner argued that respondents had suffered no injury of the type the antitrust laws were designed to prevent, relying on *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977). Both courts rejected its position, 707 F. 2d, at 1150–1152; 546 F. Supp., at 1303–1304. Petitioner does not seek review on that question in this Court. Brief for Petitioner 5, n. 1.

procompetitive justification sufficient to save the plan even when the totality of the circumstances was examined.  *Id.*, at 1157–1160.[15]  The case was remanded to the District Court for an appropriate modification in its injunctive decree.  *Id.*, at 1162.[16]

## II

There can be no doubt that the challenged practices of the NCAA constitute a "restraint of trade" in the sense that they limit members' freedom to negotiate and enter into their own television contracts.  In that sense, however, every contract is a restraint of trade, and as we have repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade.[17]

---

[15] The Court of Appeals rejected petitioner's position that it should set aside many of the District Court's findings as clearly erroneous.  In accord with our usual practice, we must now accord great weight to a finding of fact which has been made by a district court and approved by a court of appeals.  See, *e. g.*, *Rogers* v. *Lodge*, 458 U. S. 613, 623 (1982).  In any event, petitioner does not now ask us to set aside any of the findings of the District Court, but rather argues only that both the District Court and the Court of Appeals erred as a matter of law.  Brief for Petitioner 6, n. 2, 18–19.

[16] Judge Barrett dissented on the ground that the NCAA television plan's primary purpose was not anticompetitive.  "Rather, it is designed to further the purposes and objectives of the NCAA, which are to maintain intercollegiate football as an amateur sport and an adjunct of the academic endeavors of the institutions.  One of the key purposes is to insure that the student athlete is fully integrated into academic endeavors."  707 F. 2d, at 1163.  He regarded the television restraints as fully justified "in that they are necessary to maintain intercollegiate football as amateur competition."  *Id.*, at 1165.  He added: "The restraints upon Oklahoma and Georgia and other colleges and universities with excellent football programs insure that they confine those programs within the principles of amateurism so that intercollegiate athletics supplement, rather than inhibit, academic achievement."  *Id.*, at 1167.

[17] See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 342–343 (1982); *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 687–688 (1978); *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238 (1918).

It is also undeniable that these practices share characteristics of restraints we have previously held unreasonable. The NCAA is an association of schools which compete against each other to attract television revenues, not to mention fans and athletes. As the District Court found, the policies of the NCAA with respect to television rights are ultimately controlled by the vote of member institutions. By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another.[18] A restraint of this type has often been held to be unreasonable as a matter of law. Because it places a ceiling on the number of games member institutions may televise, the horizontal agreement places an artificial limit on the quantity of televised football that is available to broadcasters and consumers. By restraining the quantity of television rights available for sale, the challenged practices create a limitation on output; our cases have held that such limitations are unreasonable restraints of trade.[19] Moreover, the District Court found that the minimum aggregate price in fact operates to preclude any price negotiation between broadcasters and institutions,

---

[18] See *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 356–357; *National Society of Professional Engineers* v. *United States*, 435 U. S., at 694–696; *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 608–611 (1972). See also *United States* v. *Sealy, Inc.*, 388 U. S. 350, 352–354 (1967) (marketing association controlled by competing distributors is a horizontal combination). See generally Blecher & Daniels, Professional Sports and the "Single Entity" Defense Under Section One of the Sherman Act, 4 Whittier L. Rev. 217 (1982).

[19] See, *e. g.*, *United States* v. *Topco Associates, Inc.*, 405 U. S., at 608–609; *United States* v. *Sealy, Inc., supra; United States* v. *American Linseed Oil Co.*, 262 U. S. 371, 388–390 (1923); *American Column & Lumber Co.* v. *United States*, 257 U. S. 377, 410–412 (1921).

thereby constituting horizontal price fixing, perhaps the paradigm of an unreasonable restraint of trade.[20]

Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an "illegal *per se*" approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 19–20 (1979). In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found. Nevertheless, we have decided that it would be inappropriate to apply a *per se* rule to this case. This decision is not based on a lack of judicial experience with this type of arrangement,[21] on the fact that the NCAA is organized as a nonprofit entity,[22] or on

---

[20] See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 344–348; *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643, 646–647 (1980) *(per curiam); Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 213 (1951); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 212–214 (1940); *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 396–398 (1927).

[21] While judicial inexperience with a particular arrangement counsels against extending the reach of *per se* rules, see *Broadcast Music*, 441 U. S., at 9–10; *United States* v. *Topco Associates, Inc.*, 405 U. S., at 607–608; *White Motor Co.* v. *United States*, 372 U. S. 253, 263 (1963), the likelihood that horizontal price and output restrictions are anticompetitive is generally sufficient to justify application of the *per se* rule without inquiry into the special characteristics of a particular industry. See *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 349–351; *National Society of Professional Engineers* v. *United States*, 435 U. S, at 689–690.

[22] There is no doubt that the sweeping language of § 1 applies to nonprofit entities, *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 786–787 (1975), and in the past we have imposed antitrust liability on nonprofit entities which have engaged in anticompetitive conduct, *American Society of Mechanical Engineers, Inc.* v. *Hydrolevel Corp.*, 456 U. S. 556, 576 (1982). Moreover, the economic significance of the NCAA's nonprofit character is questionable at best. Since the District Court found that the NCAA and its member institutions are in fact organized to maximize reve-

our respect for the NCAA's historic role in the preservation and encouragement of intercollegiate amateur athletics.[23] Rather, what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all.

As Judge Bork has noted: "[S]ome activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams." R. Bork, The Antitrust Paradox 278 (1978). What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates

nues, see 546 F. Supp., at 1288–1289, it is unclear why petitioner is less likely to restrict output in order to raise revenues above those that could be realized in a competitive market than would be a for-profit entity. Petitioner does not rely on its nonprofit character as a basis for reversal. Tr. of Oral Arg. 24.

[23] While as the guardian of an important American tradition, the NCAA's motives must be accorded a respectful presumption of validity, it is nevertheless well settled that good motives will not validate an otherwise anticompetitive practice. See *United States* v. *Griffith*, 334 U. S. 100, 105–106 (1948); *Associated Press* v. *United States*, 326 U. S. 1, 16, n. 15 (1945); *Chicago Board of Trade* v. *United States*, 246 U. S., at 238; *Standard Sanitary Manufacturing Co.* v. *United States*, 226 U. S. 20, 49 (1912); *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 342 (1897).

college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.[24]

---

[24] See *Justice* v. *NCAA*, 577 F. Supp. 356, 379–383 (Ariz. 1983); *Jones* v. *NCAA*, 392 F. Supp. 295, 304 (Mass. 1975); *College Athletic Placement Service, Inc.* v. *NCAA*, 1975–1 Trade Cases ¶ 60,117 (NJ), aff'd mem., 506 F. 2d 1050 (CA3 1974). See also *Brenner* v. *World Boxing Council*, 675 F. 2d 445, 454–455 (CA2 1982); *Neeld* v. *National Hockey League*, 594 F. 2d 1297, 1299, n. 4 (CA9 1979); *Smith* v. *Pro Football, Inc.*, 193 U. S. App. D. C. 19, 26–27, 593 F. 2d 1173, 1180–1181 (1978); *Hatley* v. *American Quarter Horse Assn.*, 552 F. 2d 646, 652–654 (CA5 1977); *Mackey* v. *National Football League*, 543 F. 2d 606, 619 (CA8 1976), cert. dism'd, 434 U. S. 801 (1977); *Bridge Corp. of America* v. *The American Contract Bridge League, Inc.*, 428 F. 2d 1365, 1370 (CA9 1970), cert. denied, 401 U. S. 940 (1971); *Gunter Harz Sports, Inc.* v. *United States Tennis Assn.*, 511 F. Supp. 1103, 1116 (Neb.), aff'd, 665 F. 2d 222 (CA8 1981); *Cooney* v. *American Horse Shows Assn., Inc.*, 495 F. Supp. 424, 430 (SDNY 1980); *Los Angeles Memorial Coliseum Comm'n* v. *National Football League*, 468 F. Supp. 154, 165–166 (CD Cal. 1979), preliminary injunction entered, 484 F. Supp. 1274 (1980), rev'd on other grounds, 634 F. 2d 1197 (CA9 1980); *Kupec* v. *Atlantic Coast Conference*, 399 F. Supp. 1377, 1380 (MDNC 1975); Closius, Not at the Behest of Nonlabor Groups: A Revised Prognosis for a Maturing Sports Industry, 24 Boston College L. Rev. 341, 344–345 (1983); Kurlantzick, Thoughts on Professional Sports and the Antitrust Law: *Los Angeles Memorial Coliseum v. National Football League*, 15 Conn. L. Rev. 183, 189–194 (1983); Note, Antitrust and Nonprofit Entities, 94 Harv. L. Rev. 802, 817–818 (1981). See generally *Hennessey*

*Broadcast Music* squarely holds that a joint selling arrangement may be so efficient that it will increase sellers' aggregate output and thus be procompetitive.   See 441 U. S., at 18–23.   Similarly, as we indicated in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 51–57 (1977), a restraint in a limited aspect of a market may actually enhance marketwide competition.   Respondents concede that the great majority of the NCAA's regulations enhance competition among member institutions.   Thus, despite the fact that this case involves restraints on the ability of member institutions to compete in terms of price and output, a fair evaluation of their competitive character requires consideration of the NCAA's justifications for the restraints.

Our analysis of this case under the Rule of Reason, of course, does not change the ultimate focus of our inquiry. Both *per se* rules and the Rule of Reason are employed "to form a judgment about the competitive significance of the restraint." *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 692 (1978).   A conclusion that a restraint of trade is unreasonable may be

> "based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.   Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions." *Id.*, at 690 (footnotes omitted).

*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to

v. *NCAA*, 564 F. 2d 1136, 1151–1154 (CA5 1977); *Association for Intercollegiate Athletics for Women* v. *NCAA*, 558 F. Supp. 487, 494–495 (DC 1983); *Warner Amex Cable Communications, Inc.* v. *American Broadcasting Cos.*, 499 F. Supp. 537, 545–546 (SD Ohio 1980); *Board of Regents* v. *NCAA*, 561 P. 2d 499, 506–507 (Okla. 1977); Note, Tackling Intercollegiate Athletics: An Antitrust Analysis, 87 Yale L. J. 655, 665–666, 673–675 (1978).

render unjustified further examination of the challenged conduct.[25] But whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition.[26] Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.[27]

## III

Because it restrains price and output, the NCAA's television plan has a significant potential for anticompetitive effects.[28] The findings of the District Court indicate that this

---

[25] See *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 15–16, n. 25 (1984); *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 350–351; *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 50, n. 16 (1977).

[26] Indeed, there is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct. For example, while the Court has spoken of a *"per se"* rule against tying arrangements, it has also recognized that tying may have procompetitive justifications that make it inappropriate to condemn without considerable market analysis. See *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S., at 11–12.

[27] "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the Several States.'" *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 4–5 (1958).

[28] In this connection, it is not without significance that Congress felt the need to grant professional sports an exemption from the antitrust laws for joint marketing of television rights. See 15 U. S. C. §§ 1291–1295. The

potential has been realized. The District Court found that if member institutions were free to sell television rights, many more games would be shown on television, and that the NCAA's output restriction has the effect of raising the price the networks pay for television rights.[29] Moreover, the

legislative history of this exemption demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States* v. *National Football League,* 116 F. Supp. 319 (ED Pa. 1953), which held that an agreement among the teams of the National Football League that each team would not permit stations to telecast its games within 75 miles of the home city of another team on a day when that team was not playing at home and was televising its game by use of a station within 75 miles of its home city, violated § 1 of the Sherman Act. See S. Rep. No. 1087, 87th Cong., 1st Sess. (1961); H. R. Rep. No. 1178, 87th Cong., 1st Sess., 2–3 (1961); 107 Cong. Rec. 20059–20060 (1961) (remarks of Rep. Celler); *id.,* at 20061–20062 (remarks of Rep. McCulloch); Telecasting of Professional Sports Contests: Hearings on H. R. 8757 before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., 1–2 (1961) (statement of Chairman Celler); *id.,* at 3 (statement of Rep. McCulloch); *id.,* at 10–28 (statement of Pete Rozelle); *id.,* at 69–70 (letter from Assistant Attorney General Loevinger).

[29] "It is clear from the evidence that were it not for the NCAA controls, many more college football games would be televised. This is particularly true at the local level. Because of NCAA controls, local stations are often unable to televise games which they would like to, even when the games are not being televised at the network level. The circumstances which would allow so-called exception telecasts arise infrequently for many schools, and the evidence is clear that local broadcasts of college football would occur far more frequently were it not for the NCAA controls. This is not a surprising result. Indeed, this horizontal agreement to limit the availability of games to potential broadcasters is the very essence of NCAA's agreements with the networks. The evidence establishes the fact that the networks are actually paying the large fees because the NCAA agrees to limit production. If the NCAA would not agree to limit production, the networks would not pay so large a fee. Because NCAA limits production, the networks need not fear that their broadcasts will have to compete head-to-head with other college football telecasts, either on the other networks or on various local stations. Therefore, the Court concludes that the membership of NCAA has agreed to limit production to

court found that by fixing a price for television rights to all games, the NCAA creates a price structure that is unresponsive to viewer demand and unrelated to the prices that would prevail in a competitive market.[30]   And, of course, since as a practical matter all member institutions need NCAA approval, members have no real choice but to adhere to the NCAA's televison controls.[31]

The anticompetitive consequences of this arrangement are apparent.   Individual competitors lose their freedom to com-

---

a level far below that which would occur in a free market situation." 546 F. Supp., at 1294.

[30] "Turning to the price paid for the product, it is clear that the NCAA controls utterly destroy free market competition.   NCAA has commandeered the rights of its members and sold those rights for a sum certain. In so doing, it has fixed the minimum, maximum and actual price which will be paid to the schools appearing on ABC, CBS and TBS.   NCAA has created the mechanism which produces a uniform price for each national telecast, and a uniform price for each regional telecast.   Because of the NCAA controls, the price which is paid for the right to televise any particular game is responsive neither to the relative quality of the teams playing the game nor to viewer preference.

"In a competitive market, each college fielding a football team would be free to sell the right to televise its games for whatever price it could get. The prices would vary for the games, with games between prominent schools drawing a larger price than games between less prominent schools. Games between the more prominent schools would draw a larger audience than other games.   Advertisers would pay higher rates for commercial time because of the larger audience.   The telecaster would then be willing to pay larger rights fees due to the increased prices paid by the advertisers.   Thus, the price which the telecaster would pay for a particular game would be dependent on the expected size of the viewing audience. Clearly, the NCAA controls grossly distort the prices actually paid for an individual game from that to be expected in a free market." *Id.*, at 1318.

[31] Since, as the District Court found, NCAA approval is necessary for any institution that wishes to compete in intercollegiate sports, the NCAA has a potent tool at its disposal for restraining institutions which require its approval.   See *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 347–349, and n. 5 (1963); *Associated Press* v. *United States,* 326 U. S., at 17–18.

pete.[32]  Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference.[33]  This latter point is perhaps the most significant, since "Congress designed the Sherman Act as a 'consumer welfare prescription.'" *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 343 (1979).  A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.[34]  Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman

---

[32] See *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457, 465 (1941); *Standard Sanitary Manufacturing Co.* v. *United States*, 226 U. S., at 47–49; *Montague & Co.* v. *Lowry*, 193 U. S. 38 (1904).

[33] "In this case the rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures." *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 348.  The District Court provided a vivid example of this system in practice:

"A clear example of the failure of the rights fees paid to respond to market forces occurred in the fall of 1981.  On one weekend of that year, Oklahoma was scheduled to play a football game with the University of Southern California.  Both Oklahoma and USC have long had outstanding football programs, and indeed, both teams were ranked among the top five teams in the country by the wire service polls.  ABC chose to televise the game along with several others on a regional basis.  A game between two schools which are not well-known for their football programs, Citadel and Appalachian State, was carried on four of ABC's local affiliated stations.  The USC-Oklahoma contest was carried on over 200 stations.  Yet, incredibly, all four of these teams received exactly the same amount of money for the right to televise their games." 546 F. Supp., at 1291.

[34] As the District Court observed:

"Perhaps the most pernicious aspect is that under the controls, the market is not responsive to viewer preference.  Every witness who testified on the matter confirmed that the consumers, the viewers of college football television, receive absolutely no benefit from the controls.  Many games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised." *Id.*, at 1319.

Act was intended to prohibit. See *Standard Oil Co.* v. *United States*, 221 U. S. 1, 52–60 (1911).[35] At the same time, the television plan eliminates competitors from the market, since only those broadcasters able to bid on television rights covering the entire NCAA can compete.[36] Thus, as the District Court found, many telecasts that would occur in a competitive market are foreclosed by the NCAA's plan.[37]

---

[35] Even in the context of professional football, where Congress was willing to pass a limited antitrust exemption, see n. 28, *supra*, it was concerned about ensuring that telecasts not be subject to output limitations:

"Mr. GARY. On yesterday I had the opportunity of watching three different games. There were three different games on three different channels . . . .

"Would this bill prevent them from broadcasting three different games at one time and permit the league to enter into a contract so that only one game would be permitted?

"Mr. CELLER. The bill does not prevent what the gentleman saw yesterday. As a matter of fact the antitrust exemption provided by the bill shall not apply to any package contract which prohibits the person to whom league television rights are sold or transferred from televising any game within any area except the home area of a member club on the day when that club is playing a home game.

. . . . .

"Mr. GARY. I am an avid sports fan. I follow football, baseball, basketball, and track, and I am very much interested in all sports. But I am also interested in the people of the United States being able to see on television the games that are played. I am interested in the television audience. I want to know that they are not going to be prohibited from seeing games that might otherwise be telecast.

"Mr. CELLER. I can assure the gentleman from Virginia that he need have no fears on that score." 107 Cong. Rec. 20060 (1961).

[36] The impact on competitors is thus analogous to the effect of block booking in the motion picture industry that we concluded violated the Sherman Act:

"In the first place, they eliminate the possibility of bidding for films theater by theater. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit." *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 154 (1948).

[37] 546 F. Supp., at 1294. One of respondents' economists illustrated the point:

Petitioner argues, however, that its television plan can have no significant anticompetitive effect since the record indicates that it has no market power—no ability to alter the interaction of supply and demand in the market.[38]   We must reject this argument for two reasons, one legal, one factual.

As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output.   To the contrary, when there is an agreement not to compete in terms of price or output, "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Professional Engineers*, 435 U. S., at 692.[39]   Petitioner does not quarrel with the District Court's

"[I]t's my opinion that if a free market operated in the market for inter-collegiate television of football, that there would be substantially more regional and even more local games being televised than there are currently.   I can take a specific example from my home state of Indiana.

"I am at Ball State University, which until recently was a division one-A institution, although now is a division one-AA institution in terms of inter-collegiate football.   When Ball State plays Indiana State, that is a hotly contested game in an intrastate sense.   That is a prime example of the type of game that probably would be televised.   For example, when Ball State is playing Indiana State at Terre Haute, Indiana, that [would be] a popular game to be televised in the Muncie area, and, vice versa, in Terre Haute when the game happens to be in Muncie."   App. 506–507.

See also *id.*, at 607–608.

[38] Market power is the ability to raise prices above those that would be charged in a competitive market. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U. S., at 27, n. 46; *United States Steel Corp.* v. *Fortner Enterprises*, 429 U. S. 610, 620 (1977); *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, 391 (1956).

[39] "The fact that a practice is not categorically unlawful in all or most of its manifestations certainly does not mean that it is universally lawful. For example, joint buying or selling arrangements are not unlawful per se, but a court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent.   Even without a trial, the judge will know that these two large firms are major factors in the automobile market, that such joint selling would eliminate important price competition between them, that they are quite substantial enough to distribute their products independently, and that one can hardly imagine a pro-competitive

110

finding that price and output are not responsive to demand. Thus the plan is inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference.[40]  We have never required proof of market power in such a case.[41]  This naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis.[42]

<hr />

justification actually probable in fact or strong enough in principle to make this particular joint selling arrangement 'reasonable' under Sherman Act § 1.  The essential point is that the rule of reason can sometimes be applied in the twinkling of an eye."  P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981) (parenthetical omitted).

[40] Moreover, because under the plan member institutions may not compete in terms of price and output, it is manifest that significant forms of competition are eliminated.  See *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S., at 648–649 *(per curiam); Professional Engineers*, 435 U. S., at 692–695; *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30, 43–44 (1930).

[41] See *United States* v. *McKesson & Robbins, Inc.*, 351 U. S. 305, 309–310 (1956); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S., at 221.  See also *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 213 (1959).

[42] The Solicitor General correctly observes:

"There was no need for the respondents to establish monopoly power in any precisely defined market for television programming in order to prove the restraint unreasonable.  Both lower courts found not only that NCAA has power over the market for intercollegiate sports, but also that in the market for television programming—no matter how broadly or narrowly the market is defined—the NCAA television restrictions have reduced output, subverted viewer choice, and distorted pricing.  Consequently, unless the controls have some countervailing procompetitive justification, they should be deemed unlawful regardless of whether petitioner has substantial market power over advertising dollars.  While the 'reasonableness' of a particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.'  And where the anticompetitive effects of conduct can be ascertained through means short of

As a factual matter, it is evident that petitioner does possess market power. The District Court employed the correct test for determining whether college football broadcasts constitute a separate market—whether there are other products that are reasonably substitutable for televised NCAA football games.[43] Petitioner's argument that it cannot obtain supracompetitive prices from broadcasters since advertisers, and hence broadcasters, can switch from college football to other types of programming simply ignores the findings of the District Court. It found that intercollegiate football telecasts generate an audience uniquely attractive to advertisers and that competitors are unable to offer programming that can attract a similar audience.[44] These findings amply support its conclusion that the NCAA possesses market power.[45] Indeed, the District Court's subsidiary finding that advertisers will pay a premium price per viewer to reach audiences watching college football because of their demographic characteristics[46] is vivid evidence of the uniqueness of this product.[47] Moreover, the District Court's market

---

extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary." Brief for United States as Amicus Curiae 19–20 (footnote and citation omitted).

[43] See, e. g., United States v. Grinnell Corp., 384 U. S. 563, 571 (1966); United States v. E. I. du Pont de Nemours & Co., 351 U. S., at 394–395; Times-Picayune Publishing Co. v. United States, 345 U. S. 594, 612, n. 31 (1953).

[44] See 546 F. Supp., at 1297–1300. See also Hochberg & Horowitz, Broadcasting and CATV: The Beauty and the Bane of Major College Football, 38 Law & Contemp. Prob. 112, 118–120 (1973).

[45] See, e. g., Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U. S., at 27, n. 46; id., at 37–38, n. 7 (O'CONNOR, J., concurring in judgment); Fortner Enterprises, Inc. v. United States Steel Corp., 394 U. S. 495, 504–506, and n. 2 (1969).

[46] See 546 F. Supp., at 1298–1300.

[47] As the District Court observed, id., at 1297, the most analogous programming in terms of the demographic characteristics of its audience is

analysis is firmly supported by our decision in *International Boxing Club of New York, Inc.* v. *United States,* 358 U. S. 242 (1959), that championship boxing events are uniquely attractive to fans[48] and hence constitute a market separate from that for nonchampionship events. See *id.,* at 249–252.[49] Thus, respondents have demonstrated that there is a separate market for telecasts of college football which "rest[s] on generic qualities differentiating" viewers. *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 613 (1953). It inexorably follows that if college football broadcasts be defined as a separate market—and we are convinced they are—then the NCAA's complete control over those broadcasts provides a solid basis for the District Court's conclusion that the NCAA possesses market power with respect to those broadcasts. "When a product is controlled by one interest, without substitutes available in the market, there is monopoly power." *United States* v. *E. I. du Pont de Nemours & Co.,* 351 U. S. 377, 394 (1956).[50]

---

professional football, and as a condition of its limited exemption from the antitrust laws the professional football leagues are prohibited from telecasting games at times that conflict with intercollegiate football. See 15 U. S. C. § 1293.

[48] We approved of the District Court's reliance on the greater revenue-producing potential and higher television ratings of championship events as opposed to other events to support its market definition. See 358 U. S., at 250–251.

[49] For the same reasons, it is also apparent that the unique appeal of NCAA football telecasts for viewers means that "from the standpoint of the consumer—whose interests the statute was especially intended to serve," *Jefferson Parish Hospital Dist. No. 2* v. *Hyde,* 466 U. S., at 15, there can be no doubt that college football constitutes a separate market for which there is no reasonable substitute. Thus we agree with the District Court that it makes no difference whether the market is defined from the standpoint of broadcasters, advertisers, or viewers.

[50] See, *e. g., Jefferson Parish Hospital Dist. No. 2* v. *Hyde,* 466 U. S., at 24–25; *Northern Pacific R. Co.* v. *United States,* 356 U. S., at 7–8; *Times-Picayune,* 345 U. S., at 611–613. Petitioner seems to concede as much. See Brief for Petitioner 36–37; Tr. of Oral Arg. 6.

Thus, the NCAA television plan on its face constitutes a restraint upon the operation of a free market, and the findings of the District Court establish that it has operated to raise prices and reduce output. Under the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market. See *Professional Engineers*, 435 U. S., at 692–696. We turn now to the NCAA's proffered justifications.

IV

Relying on *Broadcast Music*, petitioner argues that its television plan constitutes a cooperative "joint venture" which assists in the marketing of broadcast rights and hence is procompetitive. While joint ventures have no immunity from the antitrust laws,[51] as *Broadcast Music* indicates, a joint selling arrangement may "mak[e] possible a new product by reaping otherwise unattainable efficiencies." *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 365 (1982) (POWELL, J., dissenting) (footnote omitted). The essential contribution made by the NCAA's arrangement is to define the number of games that may be televised, to establish the price for each exposure, and to define the basic terms of each contract between the network and a home team. The NCAA does not, however, act as a selling agent for any school or for any conference of schools. The selection of individual games, and the negotiation of particular agreements, are matters left to the networks and the individual schools. Thus, the effect of the network plan is not to eliminate individual sales of broadcasts, since these still occur, albeit subject to fixed prices and output limitations. Unlike *Broadcast Music*'s blanket license covering broadcast rights

---

[51] See *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 134–136 (1969); *United States* v. *Sealy, Inc.*, 388 U. S., at 353; *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593, 597–598 (1951); *Associated Press* v. *United States*, 326 U. S., at 15–16.

to a large number of individual compositions, here the same rights are still sold on an individual basis, only in a noncompetitive market.

The District Court did not find that the NCAA's television plan produced any procompetitive efficiencies which enhanced the competitiveness of college football television rights; to the contrary it concluded that NCAA football could be marketed just as effectively without the television plan.[52] There is therefore no predicate in the findings for petitioner's efficiency justification. Indeed, petitioner's argument is refuted by the District Court's finding concerning price and output. If the NCAA's television plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games. The District Court's contrary findings accordingly undermine petitioner's position. In light of these findings, it cannot be said that "the agreement on price is necessary to market the product at all." *Broadcast Music*, 441 U. S., at 23.[53] In *Broadcast Music*, the availability of a package product that no individual could offer enhanced the total volume of music that was sold. Unlike this case, there was no limit of any kind placed on the volume that might be sold in the entire market and each individual remained free to sell his own music without restraint. Here production has been limited, not enhanced.[54]

---

[52] See 546 F. Supp., at 1306–1308.

[53] Compare *id.*, at 1307–1308 ("The colleges are clearly able to negotiate agreements with whatever broadcasters they choose. We are not dealing with tens of thousands of relatively brief musical works, but with three-hour football games played eleven times each year"), with *Broadcast Music*, 441 U. S., at 22–23 (footnotes omitted) ("[T]o the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material. ASCAP, in short, made a market in which individual composers are inherently unable to compete fully effectively").

[54] Ensuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures. See Brodley, Joint Ventures and Antitrust

No individual school is free to televise its own games without restraint. The NCAA's efficiency justification is not supported by the record.

Neither is the NCAA's television plan necessary to enable the NCAA to penetrate the market through an attractive package sale. Since broadcasting rights to college football constitute a unique product for which there is no ready substitute, there is no need for collective action in order to enable the product to compete against its nonexistent competitors.[55] This is borne out by the District Court's finding that the NCAA's television plan *reduces* the volume of television rights sold.

## V

Throughout the history of its regulation of intercollegiate football telecasts, the NCAA has indicated its concern with protecting live attendance. This concern, it should be noted, is not with protecting live attendance at games which *are* shown on television; that type of interest is not at issue in this case. Rather, the concern is that fan interest in a televised game may adversely affect ticket sales for games that will not appear on television.[56]

Although the NORC studies in the 1950's provided some support for the thesis that live attendance would suffer if

---

Policy, 95 Harv. L. Rev. 1523, 1550–1552, 1555–1560 (1982). See also Note, United Charities and the Sherman Act, 91 Yale L. J. 1593 (1982).

[55] If the NCAA faced "interbrand" competition from available substitutes, then certain forms of collective action might be appropriate in order to enhance its ability to compete. See *Continental T. V., Inc.*, 433 U. S., at 54–57. Our conclusion concerning the availability of substitutes in Part III, *supra*, forecloses such a justification in this case, however.

[56] The NCAA's plan is not even arguably related to a desire to protect live attendance by ensuring that a game is not televised in the area where it is to be played. No cooperative action is necessary for that kind of "blackout." The home team can always refuse to sell the right to telecast its game to stations in the immediate area. The NCAA does not now and never has justified its television plan by an interest in assisting schools in "blacking out" their home games in the areas in which they are played.

unlimited television were permitted,[57] the District Court found that there was no evidence to support that theory in today's market.[58]   Moreover, as the District Court found, the television plan has evolved in a manner inconsistent with its original design to protect gate attendance.   Under the current plan, games are shown on television during all hours that college football games are played.   The plan simply does not protect live attendance by ensuring that games will not be shown on television at the same time as live events.[59]

There is, however, a more fundamental reason for rejecting this defense.   The NCAA's argument that its television plan is necessary to protect live attendance is not based on a desire to maintain the integrity of college football as a distinct and attractive product, but rather on a fear that the product will not prove sufficiently attractive to draw live attendance when faced with competition from televised games. At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market.[60]   The

---

[57] During this period, the NCAA also expressed its concern to Congress in urging it to limit the antitrust exemption professional football obtained for telecasting its games to contests not held on Friday or Saturday when such telecasts might interfere with attendance at intercollegiate games. See H. R. Rep. No. 1178, 87th Cong., 1st Sess., 3–4 (1961); 107 Cong. Rec. 20060–20061 (1961) (remarks of Rep. Celler); *id.*, at 20662; Hearings, *supra* n. 28, at 66–68 (statement of William R. Reed).   The provision enacted as a result is now found in 15 U. S. C. § 1293.

[58] See 546 F. Supp., at 1295–1296, 1315.

[59] "[T]he greatest flaw in the NCAA's argument is that it is manifest that the new plan for football television does not limit televised football in order to protect gate attendance.   The evidence shows that under the new plan, many areas of the country will have access to nine hours of college football television on several Saturdays in the coming season.   Because the 'ground rules' eliminate head-to-head programming, a full nine hours of college football will have to be shown on television during a nine-to-twelve hour period on almost every Saturday of the football season in most of the major television markets in the country.   It can hardly be said that such a plan is devised in order to protect gate attendance." *Id.*, at 1296.

[60] Ironically, to the extent that the NCAA's position has merit, it rests on the assumption that football telecasts are a unique product.   If, as the

television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output. By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act. "[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Professional Engineers*, 435 U. S., at 696.

## VI

Petitioner argues that the interest in maintaining a competitive balance among amateur athletic teams is legitimate and important and that it justifies the regulations challenged in this case. We agree with the first part of the argument but not the second.

Our decision not to apply a *per se* rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved.[61] It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics. The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

The NCAA does not claim that its television plan has equalized or is intended to equalize competition within any

---

NCAA argues, see *supra*, at 111–112, all television programming is essentially fungible, it would not be possible to protect attendance without banning all television during the hours at which intercollegiate football games are held.

[61] See Part II, *supra*.

one league.[62]   The plan is nationwide in scope and there is no single league or tournament in which all college football teams compete.   There is no evidence of any intent to equalize the strength of teams in Division I–A with those in Division II or Division III, and not even a colorable basis for giving colleges that have no football program at all a voice in the management of the revenues generated by the football programs at other schools.[63]   The interest in maintaining a competitive balance that is asserted by the NCAA as a justification for regulating all television of intercollegiate football is not related to any neutral standard or to any readily identifiable group of competitors.

---

[62] It seems unlikely, for example, that there would have been a greater disparity between the football prowess of Ohio State University and that of Northwestern University in recent years without the NCAA's television plan.   The District Court found that in fact the NCAA has been strikingly unsuccessful if it has indeed attempted to prevent the emergence of a "power elite" in intercollegiate football.   See 546 F. Supp., at 1310–1311. Moreover, the District Court's finding that there would be more local and regional telecasts without the NCAA controls means that Northwestern could well have generated more television income in a free market than was obtained under the NCAA regime.

[63] Indeed, the District Court found that the basic reason the television plan has endured is that the NCAA is in effect controlled by schools that are not restrained by the plan:

"The plaintiffs and other CFA members attempted to persuade the majority of NCAA members that NCAA had gone far beyond its legitimate role in football television.   Not surprisingly, none of the CFA proposals were adopted.   Instead the membership uniformly adopted the proposals of the NCAA administration which 'legitimized' NCAA's exercises of power.   The result was not surprising in light of the makeup of the voting membership.   Of approximately 800 voting members of the NCAA, 500 or so are in Divisions II and III and are not subjected to NCAA television controls.   Of the 275 Division I members, only 187 play football, and only 135 were members of Division I–A at the time of the January Convention. Division I–A was made up of the most prominent football-playing schools, and those schools account for most of the football games shown on network television.   Therefore, of some 850 voting members, less than 150 suffer any direct restriction on their right to sell football games to television." Id., at 1317.

The television plan is not even arguably tailored to serve such an interest. It does not regulate the amount of money that any college may spend on its football program, nor the way in which the colleges may use the revenues that are generated by their football programs, whether derived from the sale of television rights, the sale of tickets, or the sale of concessions or program advertising.[64] The plan simply imposes a restriction on one source of revenue that is more important to some colleges than to others. There is no evidence that this restriction produces any greater measure of equality throughout the NCAA than would a restriction on alumni donations, tuition rates, or any other revenue-producing activity. At the same time, as the District Court found, the NCAA imposes a variety of other restrictions designed to preserve amateurism which are much better tailored to the goal of competitive balance than is the television plan, and which are "clearly sufficient" to preserve competitive balance to the extent it is within the NCAA's power to do so.[65] And much more than speculation supported the District Court's findings on this score. No other NCAA sport employs a similar plan, and in particular the court found that in the most closely analogous sport, college basketball, competitive balance has been maintained without resort to a restrictive television plan.[66]

Perhaps the most important reason for rejecting the argument that the interest in competitive balance is served by the television plan is the District Court's unambiguous and well-supported finding that many more games would be televised in a free market than under the NCAA plan. The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of

---

[64] Moreover, the District Court found that those schools which would realize increased revenues in a free market would not funnel those revenues into their football programs. See *id.*, at 1310.

[65] See *id.*, at 1296, 1309–1310.

[66] See *id.*, at 1284–1285, 1299.

Reason is that equal competition will maximize consumer demand for the product.[67] The finding that consumption will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose.[68]

## VII

The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act. But consistent with the Sherman Act, the role of the NCAA must be to *preserve* a tradition that might otherwise die; rules that restrict output are hardly consistent with this role. Today we hold only that the record supports the District Court's conclusion that by curtailing output and blunting the ability of member institutions to respond to consumer preference, the NCAA has restricted rather than enhanced the place of intercollegiate athletics in the Nation's life. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE REHNQUIST joins, dissenting.

The NCAA is an unincorporated, nonprofit, educational association whose membership includes almost 800 nonprofit public and private colleges and universities and more than

---

[67] See *Continental T. V., Inc.*, 433 U. S., at 54–57. See also n. 55, *supra.*

[68] This is true not only for television viewers, but also for athletes. The District Court's finding that the television exposure of all schools would increase in the absence of the NCAA's television plan means that smaller institutions appealing to essentially local or regional markets would get more exposure if the plan is enjoined, enhancing their ability to compete for student athletes.

100 nonprofit athletic conferences and other organizations. Formed in 1905 in response to a public outcry concerning abuses in intercollegiate athletics, the NCAA, through its annual convention, establishes policies and rules governing its members' participation in college sports, conducts national championships, exerts control over some of the economic aspects of revenue-producing sports, and engages in some more-or-less commercial activities.  See Note, Tackling Intercollegiate Athletics: An Antitrust Analysis, 87 Yale L. J. 655, 656–657 (1978).  Although some of the NCAA's activities, viewed in isolation, bear a resemblance to those undertaken by professional sports leagues and associations, the Court errs in treating intercollegiate athletics under the NCAA's control as a purely commercial venture in which colleges and universities participate solely, or even primarily, in the pursuit of profits.  Accordingly, I dissent.

## I

"While it would be fanciful to suggest that colleges are not concerned about the profitability of their ventures, it is clear that other, non-commercial goals play a central role in their sports programs."  J. Weistart & C. Lowell, The Law of Sports § 5.12 (1979).  The NCAA's member institutions have designed their competitive athletic programs "to be a vital part of the educational system."  Constitution and Interpretations of the NCAA, Art. II, § 2(a) (1982–1983), reprinted in App. 216.  Deviations from this goal, produced by a persistent and perhaps inevitable desire to "win at all costs," have in the past led, and continue to lead, to a wide range of competitive excesses that prove harmful to students and institutions alike.  See G. Hanford, Report to the American Council on Education, An Inquiry into the Need for and Feasibility of a National Study of Intercollegiate Athletics 74–76 (1974) (Hanford); Marco, The Place of Intercollegiate Athletics in Higher Education: The Responsibility of the Faculty, 31 J. Higher Educ. 422, 426 (1968).  The fundamental policy

underlying the NCAA's regulatory program, therefore, is to minimize such deviations and "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between college athletics and professional sports." Constitution and Interpretations of the NCAA, Art. II, § 2(a), reprinted in App. 216. See 546 F. Supp. 1276, 1309 (WD Okla. 1982).

The NCAA, in short, "exist[s] primarily to enhance the contribution made by amateur athletic competition to the process of higher education as distinguished from realizing maximum return on it as an entertainment commodity." *Association for Intercollegiate Athletics for Women* v. *NCAA,* 558 F. Supp. 487, 494 (DC 1983), aff'd, 236 U. S. App. D. C. 311, 735 F. 2d 577 (1984). In pursuing this goal, the organization and its members seek to provide a public good—a viable system of amateur athletics—that most likely could not be provided in a perfectly competitive market. See *Hennessey* v. *NCAA,* 564 F. 2d 1136, 1153 (CA5 1977). "Without regulation, the desire of member institutions to remain athletically competitive would lead them to engage in activities that deny amateurism to the public. No single institution could confidently enforce its own standards since it could not trust its competitors to do the same." Note, Antitrust and Nonprofit Entities, 94 Harv. L. Rev. 802, 817–818 (1981). The history of intercollegiate athletics prior to the advent of the NCAA provides ample support for this conclusion. By mitigating what appears to be a clear failure of the free market to serve the ends and goals of higher education, the NCAA ensures the continued availability of a unique and valuable product, the very existence of which might well be threatened by unbridled competition in the economic sphere.

In pursuit of its fundamental goal and others related to it, the NCAA imposes numerous controls on intercollegiate athletic competition among its members, many of which "are similar to those which are summarily condemned when

undertaken in a more traditional business setting." · Weistart & Lowell, *supra*, § 5.12.b. Thus, the NCAA has promulgated and enforced rules limiting both the compensation of student-athletes, see, *e. g.*, *Justice* v. *NCAA*, 577 F. Supp. 356 (Ariz. 1983), and the number of coaches a school may hire for its football and basketball programs, see, *e. g.*, *Hennessey* v. *NCAA*, *supra;* it also has prohibited athletes who formerly have been compensated for playing from participating in intercollegiate competition, see, *e. g.*, *Jones* v. *NCAA*, 392 F. Supp. 295 (Mass. 1975), restricted the number of athletic scholarships its members may award, and established minimum academic standards for recipients of those scholarships; and it has pervasively regulated the recruitment process, student eligibility, practice schedules, squad size, the number of games played, and many other aspects of intercollegiate athletics. See 707 F. 2d 1147, 1153 (CA10 1983); 546 F. Supp., at 1309. One clear effect of most, if not all, of these regulations is to prevent institutions with competitively and economically successful programs from taking advantage of their success by expanding their programs, improving the quality of the product they offer, and increasing their sports revenues. Yet each of these regulations represents a desirable and legitimate attempt "to keep university athletics from becoming professionalized to the extent that profit making objectives would overshadow educational objectives." *Kupec* v. *Atlantic Coast Conference*, 399 F. Supp. 1377, 1380 (MDNC 1975). Significantly, neither the Court of Appeals nor this Court questions the validity of these regulations under the Rule of Reason. See *ante*, at 100–102, 117; 707 F. 2d, at 1153.

Notwithstanding the contrary conclusion of the District Court, 546 F. Supp., at 1316, and the majority, *ante*, at 117, I do not believe that the restraint under consideration in this case—the NCAA's television plan—differs fundamentally for antitrust purposes from the other seemingly anticompetitive aspects of the organization's broader program of self-

regulation.   The television plan, like many of the NCAA's actions, furthers several complementary ends.   Specifically, the plan is designed

> "to reduce, insofar as possible, the adverse effects of live television . . . upon football game attendance and, in turn, upon the athletic and related educational programs dependent upon the proceeds therefrom; to spread football television participation among as many colleges as practicable; to reflect properly the image of universities as educational institutions; to promote college football through the use of television, to advance the overall interests of intercollegiate athletics, and to provide college football television to the public to the extent compatible with these other objectives." App. 35.

See also *id.*, at 244, 323, 640, 651, 672.   More generally, in my view, the television plan reflects the NCAA's fundamental policy of preserving amateurism and integrating athletics and education.   Nor does the District Court's finding that the plan is intended to maximize television revenues, 546 F. Supp., at 1288–1289, 1315–1316, warrant any implication that the NCAA and its member institutions pursue this goal without regard to the organization's stated policies.

Before addressing the infirmities in the Court's opinion, I should state my understanding of what the Court holds.   To do so, it is necessary first to restate the essentials of the NCAA's television plan and to refer to the course of this case in the lower courts.   Under the plan at issue, 4-year contracts were entered into with the American Broadcasting Cos. (ABC), Columbia Broadcasting System (CBS), and Turner Broadcasting System (Turner) after competitive bidding.   Every fall, ABC and CBS were to present 14 exposures of college football and Turner would show 19 evening games.   The overall price for each network was stated in the contracts.   The networks select the games to be telecast and pay directly to the colleges involved what has developed to be

a uniform fee for each game telecast. Unless within one of the exceptions, only the designated number of games may be broadcast, and no NCAA member may arrange for televising its games other than pursuant to the plan. Under this scheme, of course, NCAA members must compete against one another for television appearances, although this competition is limited somewhat by the fact that no college may appear on television more than six times in any 2-year period. In 1983, 242 games were televised, 89 network games and 153 under the exceptions provided in the television plan. In 1983, 173 schools appeared on television, 89 on network games and an additional 84 teams under the exceptions. Report of the 1983 NCAA Football Television Committee to the 78th Annual Convention of the NCAA 61–65 (1984).[1]

The District Court held that the plan constituted price fixing and output limitation illegal *per se* under § 1 of the Sherman Act; it also held that the scheme was an illegal group boycott, was monopolization forbidden by § 2, and was in any event an unreasonable restraint of trade. It then entered an injunction that for all practical purposes excluded the NCAA from interfering with or regulating its members' arrangements for televising their football games. The Court of Appeals, while disagreeing with the boycott and monopolization holdings, otherwise upheld the District Court's judgment that the television plan violated the Sherman Act, focusing almost entirely on the price-fixing and output-limiting aspects of the television plan. The Court of Appeals, however, differed with the District Court with respect to the injunction. After noting that the injunction vested exclusive control of television rights in the individual schools, the court stated that, "[w]hile we hold that the NCAA cannot

---

[1] Television plans with similar features have been in place since 1951. The 1951–1953 plans were submitted to the Antitrust Division of the Department of Justice for review. The Department took the matter "under study," App. 284–285, and, until this litigation, has apparently never taken the position that the NCAA's television plans were unlawful.

lawfully maintain exclusive control of the rights, how far such rights may be commonly regulated involves speculation that should not be made on the record of the instant case." 707 F. 2d, at 1162. The court expressly stated, for example, that the NCAA could prevent its members from telecasting games on Friday night in competition with high school games, *ibid.*, emphasized that the disparity in revenue between schools could be reduced by "[a] properly drawn system of pass-over payments to ensure adequate athletic funding for schools that do not earn substantial television revenues," *id.*, at 1159, and indicated that it was not outlawing "membership-wide contract[s] with opt-out and pass-over payment provisions, or blackout rules." *Id.*, at 1162. It nevertheless left the District Court's injunction in full force and remanded the case for further proceedings in light of its opinion. Anticipating that the Court would grant certiorari, I stayed the judgment of the Court of Appeals. 463 U. S. 1311 (1983).

In affirming the Court of Appeals, the Court first holds that the television plan has sufficient redeeming virtues to escape condemnation as a *per se* violation of the Sherman Act, this because of the inherent characteristics of competitive athletics and the justifiable role of the NCAA in regulating college athletics. It nevertheless affirms the Court of Appeals' judgment that the NCAA plan is an unreasonable restraint of trade because of what it deems to be the plan's price-fixing and output-limiting aspects. As I shall explain, in reaching this result, the Court traps itself in commercial antitrust rhetoric and ideology and ignores the context in which the restraints have been imposed. But it is essential at this point to emphasize that neither the Court of Appeals nor this Court purports to hold that the NCAA may not (1) require its members who televise their games to pool and share the compensation received among themselves, with other schools, and with the NCAA; (2) limit the number of times any member may arrange to have its games shown on

television; or (3) enforce reasonable blackout rules to avoid head-to-head competition for television audiences. As I shall demonstrate, the Court wisely and correctly does not condemn such regulations. What the Court does affirm is the Court of Appeals' judgment that the NCAA may not limit the number of games that are broadcast on television and that it may not contract for an overall price that has the effect of setting the price for individual game broadcast rights.[2] I disagree with the Court in these respects.

## II

"In a competitive market," the District Court observed, "each football-playing institution would be an independent seller of the right to telecast its football games. Each seller would be free to sell that right to any entity it chose," and "for whatever price it could get." 546 F. Supp., at 1318. Under the NCAA's television plan, member institutions' competitive freedom is restrained because, for the most part, television rights are bought and sold, not on a per-game basis, but as a package deal. With limited exceptions not particularly relevant to antitrust scrutiny of the plan, broadcasters wishing to televise college football must be willing and able to purchase a package of television rights without knowing in advance the particular games to which those rights apply. The real negotiations over price and terms take place between the broadcasters and the NCAA rather

---

[2] This litigation was triggered by the NCAA's response to an attempt by the College Football Association (CFA), an organization of the more dominant football-playing schools and conferences, to develop an independent television plan. To the extent that its plan contains features similar to those condemned as anticompetitive by the Court, the CFA may well have antitrust problems of its own. To the extent that they desire continued membership in the NCAA, moreover, participation in a television plan developed by the CFA will not exempt football powers like respondents from the many kinds of NCAA controls over television appearances that the Court does not purport to invalidate.

than between the broadcasters and individual schools. Knowing that some games will be worth more to them than others, the networks undoubtedly exercise whatever bargaining power they possess to ensure that the minimum aggregate compensation they agree to provide for the package bears some relation to the average value to them of the games they anticipate televising. Because some schools' games contribute disproportionately to the total value of the package, see *id.*, at 1293, the manner in which the minimum aggregate compensation is distributed among schools whose games are televised has given rise to a situation under which less prominent schools receive more in rights fees than they would receive in a competitive market and football powers like respondents receive less. *Id.*, at 1315.

As I have said, the Court does not hold, nor did the Court of Appeals hold, that this redistributive effect alone would be sufficient to subject the television plan to condemnation under § 1 of the Sherman Act. Nor should it, for an agreement to share football revenues to a certain extent is an essential aspect of maintaining some balance of strength among competing colleges and of minimizing the tendency to professionalism in the dominant schools. Sharing with the NCAA itself is also a price legitimately exacted in exchange for the numerous benefits of membership in the NCAA, including its many-faceted efforts to maintain a system of competitive, amateur athletics. For the same reasons, limiting the number of television appearances by any college is an essential attribute of a balanced amateur athletic system. Even with shared television revenues, unlimited appearances by a few schools would inevitably give them an insuperable advantage over all others and in the end defeat any efforts to maintain a system of athletic competition among amateurs who measure up to college scholastic requirements.

The Court relies instead primarily on the District Court's findings that (1) the television plan restricts output; and (2) the plan creates a noncompetitive price structure that is unresponsive to viewer demand. *Ante*, at 104–106. See,

*e. g.*, 546 F. Supp., at 1318–1319. These findings notwithstanding, I am unconvinced that the television plan has a substantial anticompetitive effect.

First, it is not clear to me that the District Court employed the proper measure of output. I am not prepared to say that the District Court's finding that "many more college football games would be televised" in the absence of the NCAA controls, *id.*, at 1294, is clearly erroneous. To the extent that output is measured solely in terms of the number of televised games, I need not deny that it is reduced by the NCAA's television plan. But this measure of output is not the proper one. The District Court found that eliminating the plan would reduce the number of games on network television and increase the number of games shown locally and regionally. *Id.*, at 1307. It made no finding concerning the effect of the plan on total viewership, which is the more appropriate measure of output or, at least, of the claimed anticompetitive effects of the NCAA plan. This is the NCAA's position, and it seems likely to me that the television plan, by increasing network coverage at the expense of local broadcasts, actually expands the total television audience for NCAA football. The NCAA would surely be an irrational "profit maximizer" if this were not the case. In the absence of a contrary finding by the District Court, I cannot conclude that respondents carried their burden of showing that the television plan has an adverse effect on output and is therefore anticompetitive.

Second, and even more important, I am unconvinced that respondents have proved that any reduction in the number of televised college football games brought about by the NCAA's television plan has resulted in an anticompetitive increase in the price of television rights. The District Court found, of course, that "the networks are actually paying the large fees because the NCAA agrees to limit production. If the NCAA would not agree to limit production, the networks would not pay so large a fee." *Id.*, at 1294. Undoubtedly, this is true. But the market for television rights to college football competitions should not be equated to the markets

for wheat or widgets. Reductions in output by monopolists in most product markets enable producers to exact a higher price for *the same product*. By restricting the number of games that can be televised, however, the NCAA creates *a new product*—exclusive television rights—that are more valuable to networks than the products that its individual members could market independently.

The television plan makes a certain number of games available for purchase by television networks and limits the incidence of head-to-head competition between football telecasts for the available viewers. Because competition is limited, the purchasing network can count on a larger share of the audience, which translates into greater advertising revenues and, accordingly, into larger payments per game to the televised teams. There is thus a relationship between the size of the rights payments and the value of the product being purchased by the networks; a network purchasing a series of games under the plan is willing to pay more than would one purchasing the same games in the absence of the plan since the plan enables the network to deliver a larger share of the available audience to advertisers and thus to increase its own revenues. In short, by focusing only on the price paid by the networks for television rights rather than on the nature and quality of the product delivered by the NCAA and its member institutions, the District Court, and this Court as well, may well have deemed anticompetitive a rise in price that more properly should be attributed to an increase in output, measured in terms of viewership.

Third, the District Court's emphasis on the prices paid for particular games seems misdirected and erroneous as a matter of law. The distribution of the minimum aggregate fees among participants in the television plan is, of course, not wholly based on a competitive price structure that is responsive to viewer demand and is only partially related to the value those schools contribute to the total package the networks agree to buy. But as I have already indicated, see

*supra*, at 128, this "redistribution" of total television revenues is a wholly justifiable, even necessary, aspect of maintaining a system of truly competitive college teams. As long as the NCAA cannot artificially fix the price of the entire package and demand supercompetitive prices, this aspect of the plan should be of little concern. And I find little, if anything, in the record to support the notion that the NCAA has power to extract from the television networks more than the broadcasting rights are worth in the marketplace.

## III

Even if I were convinced that the District Court did not err in failing to look to total viewership, as opposed to the number of televised games, when measuring output and anticompetitive effect and in failing fully to consider whether the NCAA possesses power to fix the package price, as opposed to the distribution of that package price among participating teams, I would nevertheless hold that the television plan passes muster under the Rule of Reason. The NCAA argues strenuously that the plan and the network contracts "are part of a joint venture among many of the nation's universities to create a product—high-quality college football—and offer that product in a way attractive to both fans in the stadiums and viewers on [television]. The cooperation in producing the product makes it more competitive against other [television] (and live) attractions." Brief for Petitioner 15. The Court recognizes that, "[i]f the NCAA faced 'interbrand' competition from available substitutes, then certain forms of collective action might be appropriate in order to enhance its ability to compete." *Ante*, at 115, n. 55. See *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 54–57 (1977). It rejects the NCAA's proffered procompetitive justification, however, on the ground that college football is a unique product for which there are no available substitutes and "there is no need for collective action in

132

order to enable the product to compete against its nonexist-
ent competitors." *Ante,* at 115 (footnote omitted). This
proposition is singularly unpersuasive.

It is one thing to say that "NCAA football is a unique
product," 546 F. Supp., at 1299, that "intercollegiate foot-
ball telecasts generate an audience uniquely attractive to
advertisers and that competitors are unable to offer program-
ming that can attract a similar audience." *Ante,* at 111 (foot-
note omitted). See 707 F. 2d, at 1158–1159; 546 F. Supp.,
at 1298–1300. It is quite another, in my view, to say that
maintenance or enhancement of the quality of NCAA football
telecasts is unnecessary to enable those telecasts to compete
effectively against other forms of entertainment. The
NCAA has no monopoly power when competing against other
types of entertainment. Should the quality of the NCAA's
product "deteriorate to any perceptible degree or should the
cost of 'using' its product rise, some fans undoubtedly would
turn to another form of entertainment . . . . Because of the
broad possibilities for alternative forms of entertainment,"
the NCAA "properly belongs in the broader 'entertainment'
market rather than in . . . [a] narrower marke[t]" like sports
or football. Grauer, Recognition of the National Football
League as a Single Entity Under Section 1 of the Sherman
Act: Implications of the Consumer Welfare Model, 82 Mich.
L. Rev. 1, 34, n. 156 (1983). See *National Football League
v. North American Soccer League,* 459 U. S. 1074, 1077
(1982) (REHNQUIST, J., dissenting from the denial of certio-
rari); R. Atwell, B. Grimes, & D. Lopiano, The Money Game
32–33 (1980); Hanford, at 67; J. Michener, Sports in America
208–209 (1976); Note, 87 Yale L. J., at 661, and n. 31.

The NCAA has suggested a number of plausible ways in
which its television plan might enhance the ability of college
football telecasts to compete against other forms of entertain-
ment. Brief for Petitioner 22–25. Although the District
Court did conclude that the plan is "not necessary for effec-
tive marketing of the product," 546 F. Supp., at 1307, its

finding was directed only at the question whether college football telecasts would continue in the absence of the plan. It made no explicit findings concerning the effect of the plan on viewership and thus did not reject the factual premise of the NCAA's argument that the plan might enhance competition by increasing the market penetration of NCAA football. See also 707 F. 2d, at 1154–1156, 1160. The District Court's finding that network coverage of NCAA football would likely decrease if the plan were struck down, 546 F. Supp., at 1307, in fact, strongly suggests the validity of the NCAA's position. On the record now before the Court, therefore, I am not prepared to conclude that the restraints imposed by the NCAA's television plan are "such as may suppress or even destroy competition" rather than "such as merely regulat[e] and perhaps thereby promot[e] competition." *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238 (1918).

## IV

Finally, I return to the point with which I began—the essentially noneconomic nature of the NCAA's program of self-regulation. Like Judge Barrett, who dissented in the Court of Appeals, I believe that the lower courts "erred by subjugating the NCAA's educational goals (and, incidentally, those which Oklahoma and Georgia insist must be maintained in any event) to the purely competitive commercialism of [an] 'every school for itself' approach to television contract bargaining." 707 F. 2d, at 1168. Although the NCAA does not enjoy blanket immunity from the antitrust laws, cf. *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), it is important to remember that the Sherman Act "is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations . . . which normally have other objectives." *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 213, n. 7 (1959).

The fact that a restraint operates on nonprofit educational institutions as distinguished from business entities is as "rele-

vant in determining whether that particular restraint violates the Sherman Act" as is the fact that a restraint affects a profession rather than a business. *Goldfarb* v. *Virginia State Bar, supra,* at 788, n. 17. Cf. *Community Communications Co.* v. *Boulder,* 455 U. S. 40, 56, n. 20 (1982). The legitimate noneconomic goals of colleges and universities should not be ignored in analyzing restraints imposed by associations of such institutions on their members, and these noneconomic goals "may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." *Goldfarb* v. *Virginia State Bar, supra,* at 788, n. 17. The Court of Appeals, like the District Court, flatly refused to consider what it termed "noneconomic" justifications advanced by the NCAA in support of the television plan. It was of the view that our decision in *National Society of Professional Engineers* v. *United States,* 435 U. S. 679 (1978), precludes reliance on noneconomic factors in assessing the reasonableness of the television plan. 707 F. 2d, at 1154; see Tr. of Oral Arg. 24–25. This view was mistaken, and I note that the Court does not in so many words repeat this error.

*Professional Engineers* did make clear that antitrust analysis usually turns on "competitive conditions" and "economic conceptions." 435 U. S., at 690, and n. 16. Ordinarily, "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Id.,* at 691. The purpose of antitrust analysis, the Court emphasized, "is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." *Id.,* at 692. Broadly read, these statements suggest that noneconomic values like the promotion of amateurism and fundamental educational objectives could not save the television plan from condemnation under the Sherman Act.

But these statements were made in response to "public interest" justifications proffered in defense of a ban on competitive bidding imposed by practitioners engaged in standard, profit-motivated commercial activities. The primarily noneconomic values pursued by educational institutions differ fundamentally from the "overriding commercial purpose of [the] day-to-day activities" of engineers, lawyers, doctors, and businessmen, Gulland, Byrne, & Steinbach, Intercollegiate Athletics and Television Contracts: Beyond Economic Justifications in Antitrust Analysis of Agreements Among Colleges, 52 Ford. L. Rev. 717, 728 (1984), and neither *Professional Engineers* nor any other decision of this Court suggests that associations of nonprofit educational institutions must defend their self-regulatory restraints solely in terms of their competitive impact, without regard for the legitimate noneconomic values they promote.

When these values are factored into the balance, the NCAA's television plan seems eminently reasonable. Most fundamentally, the plan fosters the goal of amateurism by spreading revenues among various schools and reducing the financial incentives toward professionalism. As the Court observes, the NCAA imposes a variety of restrictions perhaps better suited than the television plan for the preservation of amateurism. *Ante*, at 119. Although the NCAA does attempt vigorously to enforce these restrictions, the vast potential for abuse suggests that measures, like the television plan, designed to limit the rewards of professionalism are fully consistent with, and essential to the attainment of, the NCAA's objectives. In short, "[t]he restraints upon Oklahoma and Georgia and other colleges and universities with excellent football programs insure that they confine those programs within the principles of amateurism so that intercollegiate athletics supplement, rather than inhibit, educational achievement." 707 F. 2d, at 1167 (Barrett, J., dissenting). The collateral consequences of the spreading of

regional and national appearances among a number of schools are many: the television plan, like the ban on compensating student-athletes, may well encourage students to choose their schools, at least in part, on the basis of educational quality by reducing the perceived economic element of the choice, see Note, 87 Yale L. J., at 676, n. 106; it helps ensure the economic viability of athletic programs at a wide variety of schools with weaker football teams; and it "promot[es] competitive football among many and varied amateur teams nationwide." Gulland, Byrne, & Steinbach, *supra*, at 722 (footnote omitted). These important contributions, I believe, are sufficient to offset any minimal anticompetitive effects of the television plan.

For all of these reasons, I would reverse the judgment of the Court of Appeals. At the very least, the Court of Appeals should be directed to vacate the injunction of the District Court pending the further proceedings that will be necessary to amend the outstanding injunction to accommodate the substantial remaining authority of the NCAA to regulate the telecasting of its members' football games.