METROPOLITAN INTERCOLLEGIATE BASKETBALL ASSOCIATION, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Cedric Dempsey on behalf of National Collegiate Athletic Association, Defendants.

No. 01 Civ. 0071(MGC).

United States District Court, S.D. New York.

Sept. 29, 2004.

Dewey Ballantine LLP, By: Jeffrey L. Kessler, David G. Feher, Julie D. Wood, David Schepard, New York, NY, Weil, Gotshal & Manges LLP, By: Bruce S. Meyer, Renée M. Fishman, New York, NY, for Plaintiff Metropolitan Intercollegiate Basketball Association.

Miller, Canfield, Paddock & Stone, P.L.C., By: Gregory L. Curtner, Kimberly K. Kefalas, Atleen Kaur, Eric McLand, New York, NY, for Defendants National Collegiate Athletic Association and Cedric Dempsey.

*OPINION*

CEDARBAUM, District Judge.

The Metropolitan Intercollegiate Basketball Association ("MIBA") sues the National Collegiate Athletic Association and Cedric Dempsey, on behalf of the NCAA (collectively "NCAA"), to challenge certain NCAA rules that the MIBA argues are anticompetitive. The complaint alleges that several of the NCAA rules, which affect Division I men's college basketball, reduce competition from preseason and postseason non-NCAA sponsored tournaments and are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The MIBA also claims that the NCAA uses the rules affecting postseason competition to achieve or attempt to gain monopoly power in the market for Division I men's college basketball tournaments, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The complaint also asserts a common law claim of tortious interference with contract. The MIBA has moved for summary judgment, on the issue of liability, on claims two and three, which challenge the rules affecting postseason play under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.[1] For

the following reasons, plaintiff's motion is denied.

BACKGROUND

The NCAA is a non-profit, voluntary, unincorporated association of over 1,200 colleges, universities, playing conferences and other affiliated organizations for the regulation of intercollegiate athletics. NCAA member institutions are divided into three divisions which reflect differences in philosophy, level of athletic competition, and size and scope of the institution's athletic programs. Within each division a member institution may also be a member of a conference. Conferences are voluntary associations of colleges and universities that organize intra-conference schedules, operate end-of-season conference championship tournaments and buy and sell media time. Division I member institutions and conferences compete at the highest level of intercollegiate athletics. In the 23 sports the NCAA regulates, it conducts 89 postseason championships. This includes championships in all Division I sports with the exception of Division IA football, where a series of bowl games determines the champion or champions. At the end of every season, the NCAA hosts the NCAA Division I Men's Basketball Championship Tournament ("NCAA Tournament"). Currently, 65 teams participate in the NCAA Tournament. Thirty-one of these teams apply to the NCAA and qualify automatically for the NCAA Tournament because they win their conference's championship ("automatic qualifiers"). The other 34 teams receive invitations or "at-large" bids to compete in the championship.

The MIBA is an unincorporated association of five New York area colleges and

[1]. The NCAA has also moved for summary judgment on these two claims. That motion will be considered separately. The NCAA's alternative motion for summary judgment on statute of limitations grounds on these two claims was denied at oral argument.

universities: Fordham University, Manhattan College, New York University, St. John's University and Wagner College. The MIBA is an affiliated member of the NCAA and all five of the MIBA institutions are members of the NCAA. Since the late 1930's, the MIBA has conducted the Postseason National Invitational Tournament ("Postseason NIT"), which is a Division I men's basketball tournament held after the end of the NCAA's regular season. As the tournament's name suggests, teams are invited to participate in the Postseason NIT. Currently, forty teams compete in the Postseason NIT.[2] The Postseason NIT is the only postseason Division I men's basketball tournament other than the NCAA Tournament.

The parties have a long and somewhat tortured relationship. The Postseason NIT began in 1938 as a six-team tournament. The NCAA Tournament began the following year and eight teams participated. Until 1953, NCAA members who received an invitation to both tournaments could choose to participate in both. For instance, in 1950, City College of New York and Bradley University participated in both the NCAA Tournament and the Postseason NIT, and City College won both tournaments.

However, the MIBA argues that beginning in the mid–1940's, the NCAA was looking to "curb" competition from the Postseason NIT. The MIBA argues that several statements by NCAA officials found in NCAA meeting minutes from the 1940's, 50's and 60's, support its theory that the NCAA adopted the challenged rules and expanded its Tournament in order to disadvantage the Postseason NIT. The NCAA disputes the MIBA's interpretation of these statements and argues that the MIBA's attempt to link these unrelated statements to rules and expansions instituted years, and sometimes decades, after the statements were made should not be credited. The NCAA adds that the statements show nothing other than that the NCAA wanted the teams it selected to participate in its Tournament. For the purposes of this motion it is unnecessary to determine the significance of these statements. Only the undisputed chronology relevant to the challenged rules need be examined.

In 1953, the NCAA adopted a rule which prohibited NCAA member institutions from participating in more than one postseason tournament (the "One Postseason Tournament Rule"). In addition, the NCAA's Tournament field was expanded to 16 teams in 1951, and to 22 teams in 1953. In 1961, the NCAA adopted a new regulation which stated that all NCAA member institution teams who received invitations were "expected" to participate in NCAA championship tournaments (the "Expected Participation Rule"). Despite this rule, in 1961, Dayton University, and in 1962, Loyola University (Chicago), Mississippi State, University of Houston, Dayton and St. John's University, declined invitations to participate in the NCAA Tournament and instead participated in the Postseason NIT. In 1970, Marquette University, which was one of

**2.** The MIBA has also conducted the Preseason National Invitational Tournament ("Preseason NIT") every year since 1985. It is another annual event for Division I men's basketball teams. The NCAA adopted special legislation to exempt the games played at the Preseason NIT from being counted toward the member institution's maximum games limitation. The exemption also allows the tournament to be held prior to the start of the regular season. The MIBA's first and fourth claims challenge certain proposed rules which would eliminate these exemptions. The MIBA argues that without the exemption from the maximum games limitation, the Preseason NIT and other similar events could not attract any teams to play and would not exist.

the top men's basketball teams that year, declined to participate in the NCAA Tournament in favor of competing in the Postseason NIT.

In 1975, the NCAA changed its rule that only one team from each conference was eligible to be selected for the NCAA Tournament. The change allowed second-place teams in conferences whose first-place team had automatically qualified for the Tournament to be considered for "at large" invitations to the NCAA Tournament. Thirty-two teams participated in the 1975 NCAA Tournament. The field was expanded to 40 teams in 1979 and again to 48 teams in 1980. Also in 1980, the restriction as to the number of teams invited from any one conference was eliminated altogether. The MIBA asserts that these expansions were made to keep additional teams from competing in the Postseason NIT. The NCAA disputes this and maintains that the decision was made in response to the addition of 26 Division I men's basketball teams between 1975 and 1980 and increased consumer demand for Division I men's basketball beginning in the 1970's.

In 1981, the NCAA was considering an expansion to a 64–team bracket. The MIBA wrote to the NCAA and expressed its concern over such a change and noted that if it were implemented, the size of the bracket would severely injure the Postseason NIT and likely destroy the MIBA's postseason tournament. Although no expansions were made that year, the NCAA expanded its Tournament to 52 teams in 1982, 53 teams in 1984 and eventually to 64 teams in 1985. The NCAA disputes that any of the expansions were motivated by anything other than legitimate business reasons, such as increasing consumer demand, an increase in the number of Division I men's basketball teams and playing conferences, and the increasing success of the NCAA Tournament.

The NCAA's Executive Committee revised the Expected Participation Rule in 1981. First effective during the 1982–83 season, this new version required an invited team to participate in the NCAA championship of its sport or in no postseason competition whatsoever (the "Commitment to Participate Rule"). This ended any uncertainty about a team's obligation to participate in the NCAA championship if invited. The Commitment to Participate Rule has been in effect for every NCAA Tournament since 1982, with the exception of the 1991 Tournament. In May of 1990, the Commitment to Participate Rule was eliminated from the NCAA Division I Manual and, due to some timing issues with the Manual's publication dates, a revised version was not replaced until August of 1991. Thus, the rule was next in effect for the 1992 NCAA Tournament.

The Commitment to Participate Rule was revised in 1991, 1999 and 2000, but the essence of the rule remained unchanged. All NCAA rules are republished in a new manual each year and every NCAA member institution must annually attest that it is in compliance with all of these rules. If a member institution does not comply with these rules, it risks fines and playing sanctions. A witness for the NCAA agreed that a failure to comply with the Commitment to Participate Rule might be considered a "major" violation. However, the NCAA maintains that this deposition testimony is immaterial since no team has ever asked to be relieved of its obligation under the rule or deliberately flouted the rule.

In 2000, the NCAA's Division I Management Council appointed an "antitrust subcommittee" to review the NCAA's rules for potential antitrust problems. The subcommittee made a recommendation that several NCAA rules, including the Commitment to Participate Rule, be eliminated and the recommendation was discussed at the

Council's July 2000 meeting. Several conference commissioners expressed concern that some teams might elect not to compete if the rule were repealed, which would lead to disorganization. The Management Council never moved to vote on the subcommittee's recommendation, and the Commitment to Participate Rule remained in effect. In July 2001, a 65th team was added to the NCAA Tournament bracket.

In 2002 and 2003, after this lawsuit was filed, the MIBA extended Postseason NIT invitations to several teams prior to the announcement of the NCAA Tournament bids. All of the teams, with three exceptions, subsequently also received invitations to the NCAA Tournament and participated in that Tournament. The three teams that did not receive bids to the NCAA Tournament did participate in the Postseason NIT. The MIBA asserts that the Commitment to Participate Rule caused this result. The NCAA disputes this and argues that there is no record evidence to show that the rule, rather than the teams' desire to compete for "the national championship," influenced the decisions of these institutions.

The MIBA filed this action to challenge several of the NCAA's rules and NCAA Tournament bracket expansions. The MIBA seeks declaratory and injunctive relief as well as treble damages. It challenges the Commitment to Participate Rule, the One Postseason Tournament Rule, and the "End of Playing Season Rule," which states that an NCAA member institution's basketball team cannot play any additional games against another team after the NCAA Tournament's championship game. Thus, the End of Playing Season Rule requires that the Postseason NIT conclude prior to the end of the NCAA Tournament. The One Postseason Tournament Rule prevents a team selected for the NCAA Tournament from participating in both tournaments. Moreover,

the parties made clear at oral argument that even if the One Postseason Tournament Rule were abolished, a team could not compete in both tournaments under the current system because it is not logistically possible. The NCAA's season ends on a Sunday and its Tournament begins on the following Thursday. Thus, the MIBA has only three days in which to conduct a postseason tournament which neither conflicts with the NCAA Tournament nor asks teams to run afoul of the End of Playing Season Rule. The MIBA asserts that it is impossible to have an entire tournament in those three days. The MIBA also challenges the automatic qualification procedure under which the champions of all 31 conferences automatically qualify for the NCAA Tournament and must participate. Lastly, the MIBA challenges the NCAA's bracket expansions. It argues that because 65 of the best teams are required to participate in the NCAA Tournament, any other postseason tournament is prevented from competing for a competitive field of teams. Although the NCAA relies on the fact that some of the teams in the NCAA Tournament actually are ranked lower than those teams in the NIT by virtue of conference championship upsets, there is no material dispute that the vast majority of the NCAA teams rank above the best NIT teams.

The MIBA seeks summary judgment only on the Commitment to Participate Rule. However, its broader claim is that the combined effect of several rules prevents it from postponing the Postseason NIT until after the NCAA Tournament or competing for the teams who participate in that Tournament.

## DISCUSSION

A motion for summary judgment shall be granted if the court "determines that there is no genuine issue of material fact

and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. Coughlin,* 763 F.Supp. 1228, 1234 (S.D.N.Y.1991). In deciding whether a genuine issue exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). But "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The MIBA argues that the Commitment to Participate Rule effectively requires any NCAA institution invited to the NCAA Tournament to boycott the Postseason NIT, and should be struck down as a violation of Sections 1 and 2 of the Sherman Act without any detailed market analysis. The NCAA argues that a boycott analysis is improper and that the MIBA is not entitled to summary judgment because the rule has no obvious anticompetitive effects.

The Commitment to Participate Rule states: "Eligible members in a sport who are not also members of the National Association of Intercollegiate Athletics will participate (if selected) in the NCAA championship or in no postseason competition in that sport." The parties do not dispute that the effect of the Commitment to Participate Rule is that an NCAA member institution who is selected to compete in the NCAA Tournament is required to do so or that team must forego postseason competition.

## I. *The MIBA's Motion for Summary Judgment: Sherman Act § 1*

■ Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." However, since nearly every contract that binds parties to act according to its terms restrains trade to a certain extent, the Supreme Court has limited § 1 of the Sherman Act "to prohibit only unreasonable restraints of trade." *NCAA v. Board of Regents,* 468 U.S. 85, 98, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (citing *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 342–43, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)). Thus, in order to prevail on its § 1 claim, the MIBA must show that there was an agreement, conspiracy, or combination between two or more entities and that the agreement was an unreasonable restraint of trade under a per se or rule of reason analysis. *Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.,* 996 F.2d 537, 542 (2d Cir. 1993).

### A. *Section 1 Scrutiny*

■ The MIBA asserts that the Commitment to Participate Rule undoubtedly constitutes an agreement among the NCAA and its member institutions because the institutions are required, each year, to agree in writing to adhere to all of the NCAA's rules. The NCAA disputes this characterization and argues that because the NCAA membership has a unified interest in the success of the NCAA Tournament, it is a single actor when it regulates the Tournament and should be exempt from § 1 scrutiny.

570

"As we have noted previously, § 1 is directed only at joint action, and 'does not prohibit independent business actions and decisions.'" *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 70 (2d Cir.1988) (quoting *Modern Home Inst. v. Hartford Accident & Indem. Co.,* 513 F.2d 102, 108 (2d Cir.1975)). "An agreement between two or more persons is fundamental to any § 1 claim." *Id.* It follows that a single-entity's behavior cannot be a § 1 violation. *See Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that § 1 scrutiny did not apply to the coordinated activity of a parent and its wholly owned subsidiary because their "complete unity of interest" made them a single enterprise). However, "[c]ourts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act." *Volvo,* 857 F.2d at 71 (citing *NCAA v. Board of Regents,* 468 U.S. 85, 99 & n. 18, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (additional citations omitted)).

The NCAA members are separate entities who clearly exist as independent institutions of higher education. These institutions each agree to abide by the rules of the NCAA on an annual basis. If a member institution violates a rule, it is faced with the prospect of NCAA sanctions. The fact that these individual members participate in the NCAA Tournament does not turn the membership into a single actor. Therefore, the NCAA's argument that it should be treated as a single entity under a *Copperweld* analysis is unpersuasive. The Commitment to Participate Rule constitutes an agreement among the NCAA member institutions and subjects the NCAA to § 1 scrutiny.

B. *Unreasonable Restraint of Trade*

Because the Commitment to Participate Rule is subject to § 1 scrutiny, it must be examined to determine whether it is an unreasonable restraint of trade. The MIBA argues that the Commitment to Participate Rule should be condemned as illegal per se because it is an agreement among the NCAA and its competing member schools to boycott any competing post-season tournament whenever a team is invited to the NCAA Tournament. The NCAA argues that the application of the per se rule is not appropriate.

Courts have found certain types of restraints of trade to be so inherently anti-competitive that they are per se invalid under § 1 of the Sherman Act, 15 U.S.C. § 1. Restraints such as price fixing, market divisions, tying arrangements and group boycotts have all been found to be unreasonable in and of themselves. *Northern Pac. Ry. Co. v. U.S.,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (citing cases).

However, in *National Collegiate Athletic Association v. Board of Regents,* 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the Supreme Court declined to apply the per se rule to the NCAA's television broadcast plan which restricted the total number of college football games which could be televised and the number of games any single college could broadcast. This decision was made despite the fact that the plan clearly limited output by restraining the quantity of television rights available for sale and fixed the price at which institutions could sell the rights, restrictions which are usually considered hallmarks of unreasonable restraints of trade. *Id.* at 99–100, 104 S.Ct. 2948. The court explained that the case involved "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101, 104 S.Ct. 2948. The court further explained:

What the NCAA and its member institutions market in this case is competition itself—contests between competing insti-

tutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. *Id.*

The court also noted that the NCAA was marketing a particular brand of football, namely *college* football as opposed to a professional sport. *Id.* at 101–02, 104 S.Ct. 2948.

> In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive. *Id.* at 102, 104 S.Ct. 2948.

Even assuming for the moment that the MIBA is correct to characterize the Commitment to Participate Rule as a facially unreasonable restraint of trade such as a group boycott, the Supreme Court made clear in *Board of Regents* that a per se analysis would not be appropriate. Because sports activities can only be carried out jointly and the NCAA must create certain horizontal restraints in order to function, the rule is not invalid in and of itself. At a minimum, the rule's possible procompetitive effects must be examined. *See, e.g., id.* at 103, 104 S.Ct. 2948. The case on which the MIBA relies is inapposite. *See Full Draw Prod. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (affirming the denial of a motion to dismiss based on the sufficient pleading of an alleged group boycott in violation of § 1 of the Sherman Act).

■ Because a per se rule should not be applied, the summary judgment evidence must be examined in accordance with "rule of reason" analysis. *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 69 F.Supp.2d 571, 582 (S.D.N.Y.1999) (citations omitted). Under the rule of reason, whether the Commitment to Participate Rule is reasonable depends on its actual effects on the market and its procompetitive justifications. *Id.* (citing *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir. 1995)).

■ "Establishing a violation of the rule of reason involves three steps." *K.M.B.,* 61 F.3d at 127. First, the "[p]laintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market...." *Id.* (citations omitted). If the plaintiff carries its burden, the burden shifts to the defendant to establish the procompetitive "redeeming virtues" of the action. *Id.* Should the defendant carry this burden, the plaintiff must then show that the same procompetitive effect could be achieved through an alternative means that is less restrictive of competition. *Id.* (citations omitted). Ultimately, the goal is to determine whether restrictions in an agreement among competitors potentially harm consumers. *Virgin Atlantic,* 69 F.Supp.2d at 582 (citations omitted).

Under a "quick look" analysis, a plaintiff is relieved of its initial burden of showing that the challenged restraints have an adverse effect on competition because the anticompetitive effects of the restraint are obvious. *See, e.g., California Dental Assoc. v. Federal Trade Comm'n,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). In *Board of Regents,* the Supreme Court endorsed the "quick look" intermediate approach because it found that the NCAA's naked restraint of the price and output of televised college football games "require[d] some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 110, 104 S.Ct. 2948. *See also Law v. NCAA,* 134 F.3d 1010, 1020 (10th Cir.1998) (affirming the condemnation of an NCAA rule which expressly restricted the compensation of certain Division I coaches by the use of "quick look" analysis). The Supreme Court has clarified that the use of the "quick look" approach is only appropriate when, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Assoc.,* 526 U.S. at 770, 119 S.Ct. 1604.

The MIBA argues that the Commitment to Participate Rule should be examined using the "quick look" approach used in *Board of Regents* and *Law.* In its view, the Commitment to Participate Rule obviously suppresses competition by prohibiting NCAA members who are invited to the NCAA Tournament from participating in competing postseason tournaments like the Postseason NIT. The NCAA objects and argues that only a full rule of reason analysis in which the MIBA must prove the anticompetitive effects of the rule is appropriate.

In *Worldwide Basketball & Sports Tours, Inc. v. NCAA,* No. 2:00 Civ. 1439, 2002 WL 32137511, *6 (S.D.Ohio July 19, 2002),[3] the court acknowledged that the challenged NCAA rule fell somewhere between those rules which amount to an obvious horizontal restraint of output found in *Board of Regents* and *Law* and those the Supreme Court stated in *Board of Regents* were clearly permissible, such as those that define the size of the playing field. In *Worldwide Basketball,* the court examined the NCAA's "Two in Four" rule. *Id.* at *1. The rule prohibits a member institution's Division I men's basketball team from participating in more than one "certified event" in a given academic year and in no more than two "certified events" every four years. *Id.* The NCAA places a limit on the number of regular season games in which a member team is permitted to compete. *Id.* The benefit of participating in a certified tournament is that no matter the number of games a team actually plays, it is only charged with having played one game for the purposes of calculating the total number of games played during that season. *Id.* The plaintiffs in that case were promoters of basketball tournaments who urged the court to consider the "Two in Four" rule under a "quick look" analysis because the rule prevented the promoters from securing the participation of "major" NCAA institutions on an annual basis. *Id.* The plaintiffs argued that the rule made the exempt tournaments less attractive to those teams who could participate that year and caused the tournaments to be less financially successful on the whole. *Id.* at *6. However, the court found that because there were 25 certified events and 319 teams in Division I at that time, the total number of available teams, as opposed to only the "major" teams, negated the plaintiffs' argument

3. This case is on appeal to the Sixth Circuit.

that output suffered, and the court declined to apply "quick look." *Id.* at *6–7.

Similarly, under the Commitment to Participate Rule, the MIBA may choose from any of the 260 teams which are not invited to the NCAA Tournament and invite those teams to the Postseason NIT. The Postseason NIT has expanded from a six-team tournament to a 40–team tournament and the MIBA has not presented any evidence that it has been unable to fill its Postseason NIT bracket each year. It cannot be said that "an observer with even a rudimentary understanding of economics" would find the Commitment to Participate Rule's adverse effect on competition so obvious. Therefore, a "quick look" analysis is not appropriate and the MIBA is required to meet its burden under the full rule of reason analysis to show the anticompetitive effects of the rule. The MIBA does not argue that it is entitled to summary judgment under the rule of reason.

II. *The MIBA's Motion for Summary Judgment: Sherman Act § 2*

■■■■ The MIBA's second argument is that it is entitled to summary judgment on the Commitment to Participate Rule because the rule is a conspiracy to monopolize under § 2 of the Sherman Act. Section Two of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The offense of conspiracy to monopolize requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *E.g., Volvo,* 857 F.2d at 74.

Even assuming that the MIBA has provided sufficient proof of the first two elements, there remains a material question of fact as to whether the Commitment to Participate Rule was enacted with the specific intent of suppressing competition from the NCAA Tournament's competitor. The MIBA has come forward with evidence of statements made during the 1940's, 50's and 60's by NCAA committee persons and argues that these prove the illegal motivation behind the adoption of the Rule. However, the NCAA responds that these statements are unrelated and show nothing about the reason for the implementation of the Commitment to Participate Rule. Considering this evidence in a light most favorable to the NCAA, the MIBA has not established specific intent to monopolize as a matter of law on its § 2 Sherman Act claim, 15 U.S.C. § 2.

CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied.[4]
SO ORDERED.

---

4. The NCAA's motion to strike sections of the November 18, 2003 affidavit of George Bisac-

ca is denied. Any legal conclusions contained therein were disregarded.