339 F.Supp.2d 545 (2004)
METROPOLITAN INTERCOLLEGIATE BASKETBALL ASSOCIATION, Plaintiff,
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Cedric Dempsey on behalf of National Collegiate Athletic Association, Defendants.
No. 01 Civ. 0071(MGC).
United States District Court, S.D. New York.
October 13, 2004.
*546 *547 Dewey Ballantine LLP, New York, NY, By: Jeffrey L. Kessler, David G. Feher, Julie D. Wood, David Schepard, for Plaintiff Metropolitan Intercollegiate Basketball Association.
Miller, Canfield, Paddock & Stone, P.L.C., New York, NY, By: Gregory L. Curtner, Kimberly K. Kefalas, Atleen Kaur, Eric McLand, for Defendants National Collegiate Athletic Association and Cedric Dempsey.

OPINION
CEDARBAUM, District Judge.
National Collegiate Athletic Association and Cedric Dempsey, on behalf of NCAA (collectively "NCAA"), have moved for summary judgment on Metropolitan Intercollegiate Basketball Association's ("MIBA") two claims which challenge NCAA rules affecting Division I men's college basketball postseason tournaments under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. MIBA's motion for summary judgment on these same two claims was denied. Metro. Intercollegiate Basketball Ass'n v. Nat'l Collegiate Athletic Ass'n, 337 F.Supp.2d 563 (S.D.N.Y.2004). For the reasons that follow, NCAA's motion is also denied. This opinion assumes familiarity with my earlier summary judgment opinion and applies the same legal standard. Unless otherwise indicated below, the material facts are the same as those set out in the prior opinion.
I. NCAA's Motion for Summary Judgment: Sherman Act § 1
Unlike MIBA, which sought summary judgment only on the Commitment to Participate Rule, NCAA seeks summary judgment on all five "Postseason Rules" which MIBA challenges in its complaint. The five Postseason Rules are: the Commitment to Participate Rule, the One Postseason Rule, the End of Playing Season Rule, the automatic qualification procedure and the bracket expansions.
A. § 1 Scrutiny
NCAA's first argument is that the Postseason Rules are not subject to § 1 scrutiny. First, NCAA argues that § 1 scrutiny is inappropriate because the rules are "noncommercial." NCAA asserts that the Postseason Rules do not regulate or restrain "trade or commerce." 15 U.S.C. § 1. Rather, the rules help to protect the connection between athletics and academics. NCAA asserts that while the rules may have an incidental effect on commerce, the regulations themselves are noncommercial in nature and thus, fall outside of the Sherman Act.
*548 NCAA relies heavily on Smith v. NCAA, 139 F.3d 180 (3d Cir.1998), in which the Third Circuit affirmed the dismissal of a challenge to NCAA's post-baccalaureate eligibility rule, which prohibits an athlete from competing at a postgraduate institution other than the institution from which he received his undergraduate degree. Although the court noted that, "eligibility rules are not related to the NCAA's commercial or business activities," id. at 185-86, the court further explained that this was because "[r]ather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics." Id. The court made an alternative finding that even if the rule were subject to Sherman Act scrutiny it would be upheld under the rule of reason. Id. at 186-87 (noting that the rule discouraged students from foregoing participation in athletics at their undergraduate institutions in order to preserve their eligibility at the postgraduate level and prevented graduate schools from inducing such behavior).
NCAA argues that the End of Playing Season Rule protects the welfare of student athletes because it prevents coaches from forcing their teams to play and practice all year long. However, MIBA is not challenging the End of Playing Season Rule as an independent antitrust violation. Rather, that rule is only challenged in conjunction with the Commitment to Participate Rule. The only "noncommercial" justification NCAA proffers for the Commitment to Participate Rule and the bracket expansions is that they were enacted in response to the "membership's changing characteristics and the growth in the number of Division I basketball teams." NCAA Brief at 8. That explanation has little to do with whether the rule is noncommercial. Moreover, one of NCAA's procompetitive justifications for the rule is that it ensures the best teams will participate in the NCAA Tournament which makes it more attractive to broadcasters, advertisers and fans. Thus, the rule cannot be said to be noncommercial.
Secondly, NCAA argues that the Postseason Rules fall into the category of rules sanctioned by the Supreme Court in NCAA v. Board of Regents, 468 U.S. 85, 101, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), such as those which determine the size of the field, the number of players on a team and those which regulate physical violence. NCAA points out that all sports leagues structure their postseason championships, and require their member teams to participate in the final championship games, if selected. NCAA argues that it is reasonable as a matter of law for a league to require its member institutions to share the responsibility of enhancing their joint product by requiring that all selected teams participate in the league's final championship game, especially since the member institutions benefit from consumer interest in the championship. Even assuming that NCAA is a sports league and that the above statements have merit, MIBA is not challenging only the Commitment to Participate Rule. MIBA argues that the combination of the Commitment to Participate Rule and the One Postseason Tournament Rule make it impossible for them to host a postseason tournament in which invitees of the NCAA Tournament participate. In combination, the rules do not simply require teams to participate in the NCAA Tournament if invited. They also prevent teams from competing in both tournaments. Therefore, the challenged rules and expansions are not so obviously reasonable as to fall into the group of restrictions sanctioned by Board of Regents.
*549 As explained in the prior opinion, MIBA has adequately shown an agreement among the 1,200 institutions which are NCAA members. Metro. Intercollegiate Basketball Ass'n, 337 F.Supp.2d 563, 569, 2004 WL 2202582, at *6. MIBA has also shown that NCAA should not be treated as a single entity under a Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), analysis. Id. Thus, NCAA's third argument to avoid § 1 scrutiny is without merit.
B. Rule of Reason
It has already been determined that the Commitment to Participate Rule must be examined under a full rule of reason analysis. Metro. Intercollegiate Basketball Ass'n, 337 F.Supp.2d at 571, 2004 WL 2202582, at *9 (declining to apply a per se rule or quick look analysis). Because the challenged rules are subject to § 1 scrutiny, it is necessary to examine the Commitment to Participate Rule, as well as the other four Postseason Rules, under the rule of reason.
1. Relevant Markets
In order to meet its initial burden under the rule of reason, MIBA must be able to show an actual adverse effect on competition as a whole in the relevant market. In order to determine whether the Postseason Rules have a substantially adverse effect on competition, the relevant market must be defined. For antitrust purposes the relevant market comprises products that consumers view as "reasonably interchangeable" with the product which the defendant sells. See, e.g., United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The definition of the relevant market is an issue of fact for trial. See, e.g., Jennings Oil Co. v. Mobil Oil Corp., 539 F.Supp. 1349, 1352 (S.D.N.Y.1982).
MIBA alleges that the relevant market is Division I men's college basketball, which includes submarkets of the business of operating Division I men's college basketball tournaments and the business of operating postseason tournaments in particular. The Postseason NIT is currently the only postseason Division I men's basketball event other than the NCAA Tournament. MIBA's expert, Professor Noll, has provided a compelling argument that the relevant market is Division I men's college basketball postseason tournaments.
NCAA argues that this is not the relevant market because the two tournaments cannot be considered "interchangeable" or "similar." According to NCAA, its tournament is the culmination of the Division I men's basketball season and is held annually to determine one champion. In contrast, it argues that the Postseason NIT is an invitational tournament which provides playing opportunities for teams not selected for the NCAA Tournament and is geared toward drawing local audiences to Madison Square Garden, as opposed to the nation-wide attraction of the NCAA Tournament. NCAA's expert, Professor Willig, has concluded that the NCAA Tournament belongs in a market defined as "marquee sports programming," along with professional sporting events such as the National Hockey League's Stanley Cup, baseball's World Series, football's Super Bowl, the National Basketball Association's Tournament, golf's Masters Tournament and the Olympic Games.
MIBA and NCAA are marketing reasonably interchangeable products in that each of their tournaments features competition between Division I men's college basketball teams after the conclusion of *550 the regular season and these games are played around the country and are nationally televised. Although NCAA tries to place itself in the market of "marquee sporting events," MIBA has produced sufficient evidence to show that college basketball is a very different product from professional basketball or other professional championships and that it appeals to fans in a different way. As the Supreme Court noted in Board of Regents, college athletics is a unique product, whose amateur rules distinguish it from professional sports and widen consumer choice. Id. at 102, 104 S.Ct. 2948. In that case, the Supreme Court went on to affirm the district court's determination at trial that the relevant market was "live college football" rather than the broad "entertainment market" advocated by NCAA. Id. at 111, 104 S.Ct. 2948. Despite NCAA's urging to the contrary, MIBA has made a sufficient showing that it will be able to prove at trial that the relevant market is Division I men's college basketball postseason tournaments.
MIBA has also made a sufficient showing that NCAA has power in the market for Division I men's college basketball postseason tournaments. The Supreme Court has defined market power as the "power to control prices or exclude competition." United States v. VISA U.S.A., Inc., 344 F.3d 229, 239 (2d Cir.2003) (citing E.I. du Pont, 351 U.S. at 391, 76 S.Ct. 994; Board of Regents, 468 U.S. at 109 n. 38, 104 S.Ct. 2948). "Such power may be proven through evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition. Alternatively, market power may be presumed if the defendant controls a large enough share of the relevant market." Id. (citing KMB Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir.1995)). Professor Noll has calculated that in 2002, NCAA had over 70 percent of attendance, over 90 percent of game revenues, over 98 percent of total revenues and over 99 percent of television revenues in the market of Division I men's college basketball postseason tournaments. This evidence suggests that NCAA earns monopoly profits and has the power to exclude competing tournaments, such as the Postseason NIT, from the market through its control over the athletic participation of its member universities and conferences.
The genuine dispute the parties have over the relevant markets is not the only issue for trial. Even assuming that MIBA's proposed markets are appropriate, other outstanding issues preclude summary judgment.
2. Analysis
Under the rule of reason, whether the restraints affecting postseason competition are reasonable depends upon their actual effect on the market and their procompetitive justifications. In order to meet its initial burden under the rule of reason, MIBA must demonstrate that within the relevant market, NCAA's actions have had substantial adverse effects on competition, such as increases in price, or decreases in output or quality. See, e.g., Visa, 344 F.3d at 238. The antitrust laws were enacted to protect competition and not competitors. See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Thus, MIBA must do more than show harm to itself. It must show harm to competition. Once that initial burden is met, the burden of production shifts to NCAA, which must provide a procompetitive justification for the challenged restraints. Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 543 (2d Cir.1993). If NCAA does so, *551 MIBA must prove either that the challenged restraints are not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition. N. Am. Soccer League v. Nat'l Football League, 670 F.2d 1249, 1259 (2d Cir.1982).
NCAA argues that it is entitled to summary judgment because MIBA cannot show that the Postseason Rules have injured competition itself. In NCAA's view, the evidence that MIBA presents shows only harm to the Postseason NIT, as opposed to harm to competition. NCAA argues that MIBA has failed to produce evidence of reduced output or monopoly prices. It further asserts that quality has not been harmed since there is great consumer satisfaction with the NCAA Tournament and quality is at its highest because the best teams compete in a single tournament and a "legitimate National Champion" is determined.
The difficulties in separating harm to MIBA from harm to competition itself are two-fold. First, the parties agree that the only postseason tournament other than the NCAA Tournament is the Postseason NIT. Second, as the Supreme Court noted in Board of Regents, each of the parties is marketing competition itself. It is clear that output has increased since the number of teams participating in both tournaments, average attendance per game and overall viewership have all increased over time. But, what is also clear is that the rules require an invitee to the NCAA Tournament to attend to the exclusion of the Postseason NIT. The rules limit to one the number of postseason contests a team may enter. Professor Noll has concluded that this injures competition because even a low-seeded team, which has little chance of advancing in the NCAA Tournament, must participate even though it might have a good chance of doing quite well in the Postseason NIT. If these lower-seeded teams had a choice about which tournament to attend, they might well choose to attend the Postseason NIT, where the chance to advance deep into the Tournament is greater. These facts tend to show that the Postseason Rules adversely affect competition by depriving colleges and fans of a potentially attractive postseason tournament choice and possible participation in an additional tournament. The quality of the competition the Postseason NIT produces would then be better, without any real detriment to the NCAA Tournament, because low-seeded teams do not advance much past the first round. Although NCAA relies on the fact that a few of the teams in the NCAA Tournament actually are ranked lower than some teams in the NIT by virtue of conference championship upsets, there is no dispute that the vast majority of NCAA teams rank above the best NIT teams. MIBA has submitted the declarations of two coaches and the athletic administrators of MIBA's member schools who state that if the Postseason Rules were different and the NIT became a more competitive tournament, their schools would seriously consider an invitation from both tournaments. While it remains to be seen whether MIBA will be able to meet its burden to prove anticompetitive effects at trial, the combination of the anticompetitive nature of requiring invitees to participate in the NCAA Tournament to the exclusion of any other postseason tournament and a sufficient showing of market power raises a genuine issue of disputed fact as to the challenged rules' effect on competition.
Moreover, NCAA's argument that the Postseason Rules are reasonable as a matter of law is not persuasive. The Postseason Rules are horizontal restraints because they affect the way in which the *552 member institutions compete with one another. See Board of Regents, 468 U.S. at 99, 104 S.Ct. 2948; see also Visa, 344 F.3d at 242-43. Therefore, NCAA's arguments that the Postseason Rules create a "presumptively legal" exclusive dealing arrangement or form permissible vertical restraints are without merit.
Next, NCAA argues that even if MIBA can meet its burden to show the anticompetitive effects of the Postseason Rules, NCAA can meet its burden to show the procompetitive justifications of the rules. On the one hand, NCAA argues that the Commitment to Participate Rule is necessary because there is a chance that without it schools might choose not to attend the NCAA Tournament, which would jeopardize the legitimacy of the National Champion. NCAA also argues that the Commitment to Participate Rule contributes to efficient scheduling because NCAA can count on the attendance of all the teams which it invites. In its view, it is also necessary "in theory" because it prevents an independent tournament from "free-riding" on NCAA's product by swooping in at the last minute and offering incentives for the best teams to compete in its tournament instead of the NCAA Tournament. On the other hand, NCAA takes the position that the rule is unnecessary because every Division I men's basketball team's goal is to qualify for or be invited to the NCAA Tournament. It stresses that no team since 1970 has ever chosen to participate in the Postseason NIT in preference to the NCAA Tournament and that no team since the institution of the Commitment to Participate Rule has asked for a waiver of the rule in order to participate in the Postseason NIT. If all of the teams selected for the NCAA Tournament would participate in that Tournament regardless of this rule, then it is difficult to see its procompetitive justifications. Therefore, it seems that there is at least a question of fact as to whether the Commitment to Participate Rule has real procompetitive justifications.
There are also questions of fact about whether the Postseason Rules are the least restrictive means of accomplishing NCAA's goals. For instance, if the Tournaments were scheduled so as not to conflict and the One Postseason Tournament Rule were abolished, participation in both Tournaments might be a reasonable possibility.
II. NCAA's Motion for Summary Judgment: Sherman Act § 2
MIBA has raised a genuine issue of fact in support of its claim that NCAA possesses monopoly power in the market of Division I men's college basketball postseason tournaments and maintains this monopoly through exclusionary means.

CONCLUSION
For the foregoing reasons, defendants' motion for summary judgment is denied.[1]
SO ORDERED.
NOTES
[1] NCAA's motion to strike sections of the March 18, 2004 affidavit of George Bisacca is denied. Any legal conclusions contained therein were disregarded.

NCAA's motion to supplement the record is granted.